ANDREW BROCK, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Brock v. Commissioner
Docket Nos. 20145-85; 20318-85; 21799-85; 866-86;[2]
22413-86; 26201-86; 29998-86; 34227-86; 21731-87
United States Tax Court
T.C. Memo 1989-641; 1989 Tax Ct. Memo LEXIS 641; 58 T.C.M. (CCH) 826; T.C.M. (RIA) 89641; December 4, 1989
Declan J. O'Donnell, for the petitioners. J. Anthony Hoefer, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: This case was assigned to Chief Special Trial Judge Marvin F. Peterson pursuant to section 7443A(b) of the Code [3] and Rules 180, 181, and 183. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. *643 OPINION OF THE SPECIAL TRIAL JUDGE PETERSON, Chief Special Trial Judge: These cases were consolidated for purposes of trial, briefing and opinion. The Commissioner determined deficiencies in, and additions to, petitioners' Federal income taxes as follows: TAXABLE
DOCKET NO.
PETITIONER
YEAR
DEFICIENCY
20145-85
Andrew Brock
1978
$  3,127.00
1981
$ 48,059.00
20318-85
Clifford H. James
1980
$ 14,082.35
and Ora N. James
1981
$ 26,638.42
1982
$ 26,293.35
21799-85
Neal Bosse and
1981
$ 37,717.42
Elizabeth A. Bosse
1982
$ 33,174.59
866-86
Norman E. Kuhl
1981
$ 16,286.00
29998-86
and Nancy J. Kuhl
1982
$ 19,615.00
22413-86
James T. Sharpe
1982
$ 12,170.00
and Marlene Sharpe
26201-86
Roy P. Besheer, Jr.
1982
$ 19,129.00
and Shiela R. Besheer
29998-86
Daniel B. Nickeson
1982
$ 50,072.00
and Enid C. Nickeson
34227-86
Steven T. Pugh and
1982
$ 31,200.00
Mary S. Pugh
21731-87
Sherman E. Evans
1982
$  6,687.00
and Marjorie Evans
1983
$  5,778.00
ADDITIONS TO TAX
I.R.C.
I.R.C.
DOCKET NO.
PETITIONER
§ 6653(a) [4]
§ 6653(a)(1) [5]
20145-85
Andrew Brock
$  156.00
$ 2,403.00
20318-85
Clifford H. James
$  704.12
and Ora N. James
$ 1,331.92
$ 1,314.67
21799-85
Neal Bosse and
$ 1,885.87
Elizabeth A. Bosse
$ 1,658.73
866-86
Norman E. Kuhl
$   814.00
29998-86
and Nancy J. Kuhl
$   981.00
22413-86
James T. Sharpe
$   608.50
and Marlene Sharpe
26201-86
Roy P. Besheer, Jr.
$   956.45
and Shiela R. Besheer
29998-86
Daniel B. Nickeson
$ 2,504.00
and Enid C. Nickeson
34227-86
Steven T. Pugh and
$ 1,608.00
Mary S. Pugh
21731-87
Sherman E. Evans
and Majorie Evans
*644 ADDITIONS TO TAX
I.R.C.
I.R.C.
DOCKET NO.
PETITIONER
§ 6653(a)(2) [6]
§ 6661
20145-85
Andrew Brock
*
20318-85
Clifford H. James
*
and Ora N. James
*
21799-85
Neal Bosse and
*
Elizabeth A. Bosse
*
$ 3,317.45
866-86
Norman E. Kuhl
*
29998-86
and Nancy J. Kuhl
*
$ 1,962.00
22413-86
James T. Sharpe
*
$ 1,217.00
and Marlene Sharpe
26201-86
Roy P. Besheer, Jr.
*
$ 1,912.90
and Shiela R. Besheer
29998-86
Daniel B. Nickeson
*
$ 5,007.00
and Enid C. Nickeson
34227-86
Steven T. Pugh and *
$ 3,120.00 Mary S. Pugh
21731-87
Sherman E. Evans
and Marjorie Evans
In addition, the Commissioner determined *645 by notice of deficiency or by amending his answer, that there was a substantial underpayment by each of the petitioners attributable to tax-motivated transactions and therefore, petitioners were subject to the increased rate of interest on deficiencies under section 6621(c). The issues for decision are (1) whether and to what extent petitioners are entitled to deductions with respect to their investments in the VOG/AMR ventures; (2) whether petitioners are subject to the addition to tax for negligence under section 6653(a) for 1978 and 1980; (3) whether petitioners are subject to the additions to tax for negligence under section 6653(a)(1) and (a)(2) for 1981, 1982 and 1983; (4) whether petitioners are subject to the addition to tax for substantial understatement of income tax within the meaning of section 6661(b); and (5) whether the deductions claimed by petitioners resulted in substantial underpayments of tax attributable to tax-motivated transactions within the meaning of section 6621(c) and, therefore, whether petitioners are liable for the increased rate of interest under that section. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation *646 of facts, the supplemental stipulations of facts and attached exhibits are incorporated herein by reference. General Background
During the early part of 1960, George Risk (Risk) developed a process to construct windows having a variable opacity for light transmission. Risk filed for a patent on August 23, 1965, for an invention in "Window Construction Having Continuously Variable Transverse Light Transmission," hereinafter referred to as variable opacity glass, or VOG. On November 22, 1965, Risk assigned his right, title and interest in the invention to his wholly owned corporation, George Risk Industries, Inc. The VOG Technology entailed the infusion of colored liquid between two panes of glass either by electronic or manual means so as to act as a shading device in windows that could have numerous commercial applications. In 1969 Risk approached Ronald J. Fairbairn (Fairbairn) about forming a corporation in order to manufacture and market the VOGs. Risk had previously developed several VOG prototypes. Risk wanted to enlist the efforts of Fairbairn in raising venture capital to begin the production of the VOGs. Risk and Fairbairn subsequently assembled a brochure *647 on the VOG and formed a corporation to manufacture and market the windows entitled Optic Science Industries ("OSI"). Risk and Fairbairn approached several businessmen in Omaha, Nebraska about investing in such a venture and from that effort raised approximately $ 225,000. Risk licensed his VOG patent to OSI for $ 250,000, most of which was to be paid on a deferred basis. During 1970 through 1972 Risk and Fairbairn expended considerable time and effort developing the VOG technology and raising additional venture capital so production of the VOG could begin. During the above period, Fairbairn worked on the OSI-VOG venture full-time. Considerable changes were made in the VOG model as described in Risk's patent. Using the money that Fairbairn and Risk had raised, Fairbairn devoted considerable effort to improving the VOG's sealing mechanism, the liquid that was used to darken the window, and the mechanism for injecting the liquid. Fairbairn additionally made several prototypes of the VOG. In applying the VOG technology, Fairbairn developed ski goggles, a welder's helmet, and at least one VOG prototype window was installed in a commercial building. After raising the initial $ *648 225,000, Risk and Fairbairn traveled extensively around the country attempting to raise additional capital for the VOG. Risk's and Fairbairn's search was unsuccessful, but in the process they expended a great deal of the funds that had been raised through the private offering. Approximately $ 100,000 of the $ 225,000 which had been raised to develop the VOG, went to GRI in the form of loans against GRI's inventory. However, GRI never repaid the loans. The loans were written off as a loss and GRI filed for bankruptcy in 1973. Risk subsequently enlisted another individual, Richard Emling (Emling), to help raise additional venture capital. OSI's name was changed to Nu-Vu Corp. (Nu-Vu). Emling succeeded in raising additional capital from investors on the pretense that they would have an opportunity to manufacture the VOG ski goggles. Emling prepared a report for Risk which was sent to the Nu-Vu investors in November, 1972. The report detailed the VOG's "greatly improved design which entirely eliminates tubing, remote reservoirs and other external parts." The report additionally referred to several ventures underway at that time to market the VOG. However, those efforts proved *649 unsuccessful. Nu-Vu subsequently defaulted on the licensing agreement with Risk. Risk, though, continued to conduct further developmental research on the VOG. Formation of VOG Venture
In 1980, Risk decided to resurrect the VOG venture. Risk organized GRI Research and Development Laboratories, Corp. ("VOG R&D Lab") as a wholly owned subsidiary of GRI to perform research and development (R&D) on the VOG; Risk was named president of VOG R&D Lab. On March 14, 1980, GRI transferred GRI's interest in the VOG to the VOG R&D Lab. In the early formative stages of the venture, Risk compiled a list of various VOG component names, and a price was assigned to each component. Risk utilized a number of salesmen in marketing the venture. Petitioners, in order to participate in the VOG venture, were required to sign a contract and a promissory note with the VOG R&D Lab. Furthermore petitioners were to make a cash payment of 25% of the total contract price. The salesmen thereupon received an up-front commission equal to 40% or 50% of petitioners' cash down payments. The alleged purpose of the VOG venture was to research and develop variable opacity glass windows suitable for installation *650 and use in commercial buildings and individual homes. Under the heading "DESCRIPTION OF PROGRAM," the R&D Program stated "[The R&D Lab] will perform R&D leading to the development of Variable Opacity Glass." The R&D Program contained a schedule which was a list of components from which petitioners could choose for the purpose of participating in the venture. The schedule identified the component, stated the sales price (the total contract amount), the down payment (25%), the promissory note amount (75%), the deductible expense (100%), and the "50% Tax Benefit." The schedule also listed for each component a "Royalty on Numbers of Windows Sold Per Year," wherein different amounts were stated for 50,000, 100,000 and 200,000 windows, depending upon the number sold. The first component in the VOG project was sold on November 13, 1980. The last component was sold on December 31, 1982. The total amount of the executed contracts was $ 3,387,810.00, comprised of $ 846,952.50 in cash and $ 2,540,857.50 in promissory notes. The following chart indicates the identity, date of purchase, component purchased, and amounts regarding the VOG venture. VOG INVESTORS Petitioner
Date of Component
Total Amt.
Purchase
Norman Kuhl
11-13-81
#96 Detector U frame mount
$ 15,200
#97 Fluxer
$ 17,200
Andrew Brock
11-18-81
#105 Digital/analog converter
$ 22,400
#106 Six pin polarized plug
$ 20,000
#107 PC Board #7
$ 18,400
#108 6 bit analog/digital
converter
$ 20,800
#110 PC Board #8
$ 20,400
William Kostka
11-24-81
#94 Fixed pole piece
$ 17,200
Neal Bosse
12-30-81
#92 Cylindrical main frame
$ 20,800
Clifford James
12-30-81
#93 Solenoid Coil
$ 19,600
Roy Besheer
09-02-82
#17 Cover, outflow
$ 20,448
#18 Ball check
$ 21,720
Timothy Sharpe
09-02-82
#45 Polarized relay
$ 31,680
Steven Pugh
12-02-82
#47 Guide valve
$ 29,280
#50 Threaded manifold
$ 33,120
Jelan Investments
12-18-82
#37 Impellar shaft
$ 47,760
(Sherman Evans)
#36 Injector housing, main
$ 47,520
3% interest
12-31-82
#115 Bellows, fixed end
$ 22,464
*651 The VOG Purchase Agreement and Note
The VOG R&D Lab offered to perform research and development on the separate components for petitioners. The basic document that each petitioner executed was a "purchase agreement." The purchase agreement was executed on behalf of the VOG R&D Lab by George Risk, as president. The purchase agreement stated that the VOG R&D Lab agreed to perform research and development with respect to the specific components which were described in an attachment to the purchase agreement. The purchase agreement further stated that petitioners would have, "along with other purchasers, if any, all right, title and interest in and to all plans, specifications and technological information resulting from the research and development (collectively 'information') performed." The possible need for additional research and development of the VOG was detailed in paragraph 15 of the purchase agreement and stated as follows: 15. Additional Research and Development. If additional research and development is required beyond the research and development performed under this Agreement, Purchaser agrees that the information produced under this Agreement and all *652 rights and title thereto may be used for such further research and development. If such further research and development is undertaken, Purchaser's interest in all Information procured shall be the percentage which the amount contributed by the Purchaser bears to the total amount contributed by all Purchasers applied to the original research under this Agreement and the additional research performed pursuant to this paragraph. In addition, petitioners executed a promissory note payable to the VOG R&D Lab. The promissory note bore interest at 11-1/2% per annum. Payments under the promissory note were to be made initially from 50% of the gross proceeds attributable to exploitation of the information. Petitioners, therefore, were not obligated to make any payments until December 31, 1989, at which time the unpaid balance was due and payable. However, the promissory note provided that petitioners could extend the due date for two successive three-year periods by paying an additional fee of 10% of the outstanding principal balance of the note. Payment of the promissory note was secured by an interest in the information. The VOG R&D Lab made no specific commitments to petitioners. *653 The VOG R&D Lab simply agreed "to perform research and development with respect to variable opacity glass * * *" The purchase agreement stated that the research and development would be as described in the R&D Program. However, the R&D Program stated that the research would be performed pursuant to the purchase agreement. Neither document described why further development of the VOG was necessary, the methodology to be employed, or when the venture would be completed. Furthermore, no indication was given as to how petitioners' money would be spent. The VOG R&D Lab not only refrained from making any promises, it also expressly announced the possibility that its efforts might be unsuccessful. The R&D Program specifically stated that the R&D performed under the agreement might constitute only a part of the components needed for completion of the VOG. The R&D Program stated that each petitioner would acquire the rights to the information generated by R&D. The R&D performed for a specific purchaser would relate to a specific glass component. The information consisted only in rights, ideas, designs, and specifications which were to be developed through the R&D. Petitioners, either *654 individually or collectively, acquired no interest either in the pre-existing VOG technology or in the newly-created components that resulted from R&D. If nothing resulted from the research, or if no progress or improvement of the VOG was made under the venture, petitioners would acquire nothing of substance under their purchase agreements. In that event, all interest in the VOG would be retained by the VOG R&D Lab. The R&D Program further stated that Risk had licensed the use and benefits of the patent to VOG R&D Lab, for purposes of research and development. The R&D Program specifically referred to the VOG as a "proprietary product" of VOG R&D Lab. Petitioners acquired rights which related only to the specific components in which petitioners invested. Petitioners acquired no interest in the information regarding the components that were not sold to petitioners or in any new components that might arise during the research program. Information relating to unlisted and newly created components would belong to the party that owned the basic underlying VOG technology. Such a party was the VOG R&D Lab. Research and Development Under VOG Venture
The VOG R&D Lab had no *655 equipment, facilities or employees. The R&D Program stated that the actual developmental work would be performed on a "sub-contract" basis with GRI and with possible outside contractors. There was no written agreement of substance covering the subcontract work that GRI was supposed to perform. A one-page document dated December 30, 1980, was executed by Risk on behalf of the VOG R&D Lab and by GRI's chief engineer, Robert Nickels (Nickels) on behalf of GRI. The document stated that the VOG R&D Lab agreed to contract with GRI for all of the research and development on the VOG and related items. Payment for such services was to be billed by "pro forma invoices, by advance payments, or as services are performed." The document contained no description of the work that GRI was to perform, the methodology to be employed, when the work was to be completed, or the results to be actually sought. No one was hired by VOG R&D Lab specifically to work on the VOG. At GRI, the only individual who did significant work on the VOG was Steve Selves (Selves). Selves worked under the direct supervision of George Risk. Selves had no formal education as an engineer or training in glass technology. *656 Selve's former employment was as a laborer in oil fields. In 1983 Selves began work on the VOG. Selves worked on the VOG project for approximately 10 months, whereupon Selves discontinued any further developmental research on the VOG. GRI's activities were devoted almost exclusively to the manufacture of its principal products of keyboards, burglar alarm components, and electrical switches. When the VOG venture began, GRI's chief engineer was Nickels. Nickels, upon observing a demonstration of the VOG at trial and examining the VOG's then current internal mechanisms, noted there was no significant progress made in the development of the variable opacity glass invention since the VOG program was initiated. Furthermore, Risk, who gave a demonstration of the VOG at the trial of this case, was unable to describe any research advancements made under the VOG program. Neither Risk nor GRI made any sincere effort to perform the research and development needed to improve the VOG. In addition to GRI, there were two corporations that had contracted to perform developmental research on the VOG. One such corporation was Aluminum & Window Consultants, Corp. ("AWC"). AWC was a one-man *657 corporation organized by William Jackson (Jackson). The VOG R&D Lab and AWC had contracted for developmental work to be performed by AWC. The document was entitled "Agreement for Consulting Services, Research and Development Activities," dated May 1, 1982. No research or development of the VOG by Jackson or AWC ever took place. The additional subcontractor for the VOG program was S & M Engineering Development Corp. (S & M). S & M was organized by Mel Pauley (Pauley). Pauley had no contractual obligation with the VOG R&D Lab. During 1983 and 1984, Pauley wrote a series of 56 reports for the R&D Lab. Each report covered a different component part of the VOG. The reports contained a number of schematics. There was also a narrative portion of each report. Such narrative portion was repetitive from one report to another. The reports consisted of explanations of how to produce the various VOG components. Clearly, no, or very little, research was done on the VOG, but in an effort to hide this fact GRI maintained false time sheets to show that certain employees spent hundreds of hours on VOG research and development. The Licensing Agreement
Considerable emphasis *658 was made in the VOG R&D Program that each petitioner was to be in business for himself and that each bore the responsibility for commercially exploiting his or her information. However, there was no significant commercial value in the individual components other than as constituent components of the VOG. Potential marketability of the individual components, apart from the VOG, was very remote. Each petitioner was purportedly responsible for his or her own marketing efforts. The R&D Program recognized that a pooling of petitioners' information would be needed in order to have any chance for commercial success. The R&D Program specifically stated that the components "will not be marketed until successfully incorporated into a working prototype." The section of the R&D Program entitled "Marketing" was a discussion of "potential income from Variable Opacity Glass" rather than potential income from marketing the component parts. Indeed, the R&D Program recognized the unlikelihood that an individual investor could market his or her information other than as part of a joint effort. The R&D Program stated that if a purchaser wished to transfer his or her rights in the information, it *659 was likely that no existing market for such rights would be found. Furthermore it was not anticipated that any public market would develop for the purchase and sale of the information generated by R&D Lab. The purported method through which petitioners were to realize a monetary return was a "licensing agreement." The licensee was entitled Optic Science Industries, Corp. ("New OSI"). Petitioners executed this agreement along with the purchase agreement and the promissory note. The licensing agreement granted New OSI the following rights: a non-exclusive world-wide right and license to use, employ, and exploit all plans, specifications and technological information resulting from the research and development (collectively "Information") performed on behalf of Licensor by GRI Research with respect to the Components for purposes of manufacturing, marketing, selling and installing variable opacity glass and its Components and applying for, prosecuting and obtaining any and all patents, patent applications or other certifications for the Components. The licensing agreement indicated that New OSI was a viable corporation with Fairbairn as its president. The only activity New OSI *660 conducted was the drafting of articles of incorporation. There were no shareholders, no officers and no directors. No meetings of any sort were held. On January 19, 1983, Fairbairn sent Risk correspondence terminating Fairbairn's association with New OSI. In the latter part of 1983 Risk contacted Jackson and asked him to assume the presidency of New OSI. Jackson was never formally installed as president of New OSI. Jackson's only activity for New OSI was to sign two letters prepared by Risk to the VOG investors stating that New OSI was analyzing research data for the manufacture and production of the VOG and other products. Jackson returned the letters to Risk for mailing. Jackson has no knowledge as to any activity concerning the VOG or any other product that was to be produced. New OSI was incorporated solely to give the appearance of an active research and development program for the VOG venture.
Formation of AMR Venture
Risk initiated the automatic utility meter reader (AMR) venture in 1981. It was patterned after the VOG venture. Documents for the AMR venture, including the R&D Program, purchase agreement, petitioners' promissory notes, and the licensing agreement *661 were very similar to the VOG documents. Risk organized a second GRI Research and Development Laboratories, Corp. ("AMR R&D Lab"). Unlike the VOG R&D Lab, the AMR R&D Lab was not a subsidiary of GRI. In November 1981, Risk transferred to the AMR R&D Lab his interest in the utility meter reader technology and the patent application that had been filed in 1978. Like the VOG R&D Lab, the AMR R&D Lab had no facilities, no equipment and no employees. As with the VOG program, Risk initiated the AMR venture by having a list compiled of the component parts. There was no schematic to show how the AMR components were apparently to be assembled. According to the R&D Program, the purpose of the AMR venture was "to research and develop components of an AUTOMATIC METER READING DEVICE to read electric, gas and water meters via telephone lines or radio." Under the heading, "DESCRIPTION OF PROGRAM," the R&D Program stated that "[The R&D Lab] will perform R&D leading to the development of an Automatic Meter Reading System." As with the VOG venture, the AMR R&D Program included a list of components from which petitioners could choose for purposes of entering the venture. The list was entitled *662 "Contract Price Schedule." The schedule was essentially similar to the components schedule in the VOG R&D Program. Therefore, the AMR schedule supplied a name and sales price for each component. Four separate schedules of AMR components were prepared. Purchase agreements were executed totalling $ 1,783,600.00. The total contractual amount was comprised of $ 445,900.00 in cash and the balance of $ 1,337,700.00, in promissory notes. The following chart identifies the purchaser, date of purchase and amounts regarding the AMR venture. AMR INVESTORS
Petitioner
Date of Purchase
Total Amount
Neal Bosse
10-14-82
$ 34,000
Clifford James
10-14-82
$ 35,600
Jelan Investments
12-31-82
$ 239,000
(Sherman Evans)
3% interest
Norman E. Kuhl
12-30-82
$ 42,800
Dan Nickeson
12-30-82
$ 117,600
The AMR Agreements
The AMR documents suffer from the same shortcomings as the VOG documents. No explanation of the proposed development program was given. The AMR documents contain the same circuitous references found in the VOG documents. AMR R&D Lab agreed in the purchase agreement to perform research and development as "described *663 in the Memorandum." The R&D Program in turn stated that the research would be performed pursuant to the purchase agreement. As with the VOG venture, neither the AMR R&D Program nor the AMR purchase agreement described the methodology to be employed, when the AMR venture would be completed, or how petitioners' money would be spent. As in the VOG venture, the AMR R&D Lab refrained from making any promises. The AMR R&D Program and purchase agreement contained the same provisions regarding the need for further research and development as did the VOG documents. The R&D Program gave every indication that the AMR had already been perfected by stating: The research and development department of [GRI] has succeeded in bringing to a reality the computer reading of electric, gas and water meters via radio, telephone or other communication lines. In the purchase agreement for the AMR venture, petitioners were referred to as the "Client," whereas in the VOG purchase agreement, petitioners were referred to as the "Purchaser." Otherwise, each agreement, concerning petitioners' "Rights to Technological Information," was identical. The description of petitioners' rights set forth in the AMR *664 R&D Program closely tracked the description of rights set forth in the VOG R&D Program. The R&D Program stated that each petitioner "shall acquire all right, title and interest in and to all plans, specifications and technological information, resulting from the R&D (collectively 'Information') performed on behalf of Client by GRI." Such information would consist of only the rights, ideas, designs, and specifications which may be developed through the R&D Lab. The research and development performed for a specific Client was to relate to a specific component. As in the VOG venture, petitioners in the AMR venture, either individually or collectively, acquired no interest either in the pre-existing technology or in newly created components that would result from the research. Moreover, there was no provision in either the purchase agreement or the R&D Program for petitioners whose components would be eliminated during the course of research and development. Under the AMR venture, as with the VOG venture, petitioners acquired only the results of research to be performed by the R&D Lab. As was true of the VOG, the AMR technology, as originally conceived, had been considerably enhanced *665 and advanced prior to petitioners' involvement. AMR Licensing Agreement
The AMR R&D Program contained a standard "Licensing Agreement." The purported licensee for the AMR was Megavision Corp. (Megavision) with Nickels, as president. Megavision had no employees and no manufacturing facilities. The AMR licensing agreement had a schedule attached describing the components in which the licensor had invested. That schedule additionally detailed the royalties, in dollars, that the licensor was to receive based on 300,000, 600,000 and 1,200,000 AMR installations and an average selling price per installation. R&D Under the AMR Venture
The AMR venture entailed no outside subcontractors. The only "subcontractor" was GRI. The R&D Lab and GRI had no written contract concerning research and developmental work on the AMR. Shortly after the AMR venture was initiated in October, 1982, George Risk suffered a stroke and was largely incapacitated for a year. GRI hired no one to conduct developmental research on the AMR. Nickels stated that while he was employed at GRI, there was no work performed on the AMR after initiation of the AMR venture. Rather, all efforts *666 were devoted to the manufacture and sale of GRI's established commercial products of keyboards, switches and security products. There was never a concerted effort after initiation of the venture to develop the AMR. Nickels, after observing a demonstration of the AMR at trial noted very little difference between operation of the 1988 model AMR and the device as it existed prior to initiation of the AMR venture.
Emphasis on and Resulting Treatment of Tax Benefits
In both the VOG and AMR programs, there was a heightened emphasis on tax benefits to be derived by petitioners from subscribing to the respective ventures. The R&D Programs contained repeated assertions that petitioners could obtain a write-off (deduction) worth four times petitioners' actual cash investment and an actual reduction in petitioners' tax liabilities in twice the amount of petitioners' cash investment. The R&D Program emphasized that the respective ventures were being organized and offered for individuals who had a great need for tax write-offs because their high income placed them in the upper income tax brackets. The R&D Programs described the offerings as "Tax Shelter Investment Programs." The *667 R&D Programs expressly advised petitioners that the potential tax benefits were to be an important consideration in petitioners' decision whether or not to join the venture. As each component was listed on the component schedules, an amount was given for the tax deduction petitioners would obtain by contracting for that respective component. Part of the information required from each petitioner was his or her gross taxable income for the preceding, current and succeeding years. Furthermore, petitioners were required to provide a list of his or her tax losses from any other applicable "shelter" investments. Included as part of each petitioners' Federal income tax return was a Schedule C for the VOG or AMR venture. Petitioners reported losses from the VOG and or AMR venture equal to the full amount of their purchase agreements. In the notices of deficiency respondent determined that petitioners' alleged losses from the VOG and or AMR venture were not allowable in any amount. Respondent also determined that petitioners' deductions from the VOG and or AMR ventures were the result of negligence or intentional disregard of rules and regulations. Respondent further determined that *668 the deficiencies in tax resulting from participation in the VOG and AMR venture constituted substantial underpayments attributable to tax motivated transactions within the meaning of section 6621(c). Respondent also determined that petitioners are liable for a substantial understatement of income tax within the meaning of section 6661. OPINION At the trial petitioners orally moved to place the burden of proof on respondent contending that respondent had raised a new issue. Petitioners' oral motion was denied without prejudice to renew the motion at the end of the trial. Although petitioners have failed to file a further motion, petitioners have raised this same matter in their brief. Petitioners contend that respondent has the burden of proof since respondent's theory in this case is based on a fraudulent scheme. The record does not support petitioners' position. Respondent has not raised the issue of fraud, and has not determined an addition to tax for fraud, and, therefore, it is not an issue in this case. The first issue for decision is whether respondent properly disallowed petitioners' deductions claimed during the years in issue. Each deduction is appropriate only *669 if the purchases of the VOG and or AMR components were investments for the production of income or for use in a trade or business. An investment is used in a trade or business, or held for the production of income only when the investor enters into the transaction with the actual and honest objective of making a profit. Fuchs v. Commissioner, 83 T.C. 79, 98 (1984); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Respondent's primary argument is that petitioners did not purchase or hold the VOG and or AMR components with the objective of making a profit. Petitioners argue that the record establishes that they were motivated by a profit objective and that the deductions were properly taken. Petitioners bear the burden of proof on this issue. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Whether a taxpayer had an actual and honest profit objective is a question of fact to be resolved from all the surrounding facts and circumstances. *670 Beck v. Commissioner, 85 T.C. 557, 569 (1985); Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). The parties have framed the issue in terms of whether petitioners' activities were not engaged in for profit within the meaning of section 183, which imposes a subjective test. In Rose v. Commissioner, 88 T.C. 386, 408-415 (1987), affd. 868 F.2d 851 (6th Cir. 1989), we determined it was preferable to analyze certain transactions, the so-called "generic tax shelters," under a unified approach emphasizing objective factors into which the historic subjective and objective tests would merge. Rose v. Commissioner, supra at 412-415. The test incorporates factors relied upon in cases decided under section 183. Rybak v. Commissioner, 91 T.C. 524, 535 (1988). The VOG and AMR ventures possess each of the characteristics articulated in Rose v. Commissioner, supra, as the criteria establishing a generic tax shelter. The promotional materials focused on the tax benefits of the transaction; the demanded *671 purchase price was accepted without negotiation; the right to commercially exploit the components was difficult to value in the abstract and the value placed on this right greatly exceeded the value of the components; the cost of producing the components was a fraction of the stated purchase price; and the bulk of the purchase price was deferred through the use of promissory notes which were nonrecourse in substance. Rose v. Commissioner, supra at 412. Accordingly, we have determined that petitioners' activities with respect to the VOG and AMR ventures fall within the definition of a generic tax shelter. We will apply the Rose test to decide whether petitioners' investments in the VOG and AMR ventures were devoid of economic substance. [7]
The Rose analysis requires that we look for objective indications of economic substance in the purchase of the VOG and AMR components, relying on four factors. These factors are (1) the dealings between petitioners and the promoters; (2) the relationship between the sales *672 price and the fair market value; (3) the structure of the financing; and (4) perceived Congressional intent. Rose v. Commissioner, supra at 415-422. A. The Dealings Between Petitioners and VOG/AMR. There were no arm's-length dealings with the R&D Labs by petitioners. All terms of the programs and prices for the components were fixed in advance by George Risk. Notwithstanding the many flaws and shortcomings of those terms, no negotiations occurred. Petitioners displayed passivity and trustfulness in Risk when the R&D Program and preprinted agreements were submitted for petitioners' approval. The nebulous nature of petitioners' interests under the VOG and AMR venture, was due to the absence of any arm's-length dealings between the parties. If the documents had been negotiated in a forthright manner, the numerous uncertainties could have been eliminated. The absence of true negotiations is also evident in several other aspects of the VOG/AMR ventures. One of the glaring omissions from the shelter documents was any commitment by Risk or the R&D Labs. As noted by respondent's expert, a legitimate research and development program would include *673 several provisions that were absent from the respective ventures. Identification of the specific problems or shortcomings that needed to be overcome, what approach would be employed to accomplish the intended result, and what timetable would be followed in completing the work were provisions that were absent. The R&D Labs not only promised nothing, they promised to do nothing. Obviously, there was an implication that research and development would be performed. However, the statements in that regard lacked any definitive substance. References regarding what the R&D Labs would do were so vague that the presence of an honest intention is doubtful. The shelter documents can only be described as illusory. The lack of economic substance is evident not only in petitioners' dealings with Risk and the R&D Labs, but also in the dealings with other involved entities and related individuals connected with the respective ventures. One area that is rife with a lack of arm's-length dealings is the "subcontracts" that R&D Labs made with GRI, AWC and S & M for developmental work on the VOG and AMR. The R&D Labs had no facilities, no equipment, no employees, and no ability to perform *674 any research themselves. Supposedly, the work was to be performed by GRI, AWC and S & M. However, the R&D Labs' dealings with these other entities were more apparent than real, and lacked the formalities one would expect of dealings that concerned hundreds of thousands and even millions of dollars. Petitioners would like this Court to believe that GRI performed millions of dollars of developmental work on the VOG and AMR for the R&D Labs. However, the only written document concerning that work was a very brief, vague, and noncommittal document entitled "Contractual Agreement" dated December 30, 1980. If the dealings between the R&D Labs and GRI had been at arm's length, it would have also been expected that GRI would have periodic accountings to the R&D Labs for its time and efforts. However, the only significant evidence with regard to such accountings was Nickel's testimony that falsified material and labor records were prepared regularly showing gross amounts of work on the VOG that did not take place. The purported agreement between the VOG R&D Lab and AWC is another example of less than arm's-length dealings. On its face, the document purported to be a research contract *675 where AWC would perform developmental work on the VOG for the R&D Lab. The agreement called for an assignment to AWC of notes having a face value of $ 399,195.00. The notes were discounted to 50% of their face value and were supposedly to compensate AWC for research and developmental services for the VOG. William Jackson, AWC's president, testified that R&D services were never actually contemplated, and the notes were transferred to enhance AWC's balance sheet. Jackson did conduct investigative work as to whether a few of the VOG components could be purchased or fabricated. However, the only charge for that work was Jackson's out-of-pocket expenses, which totaled a mere $ 2,516.21. The R&D Lab and AWC agreement was anything but an arm's-length dealing. Mel Pauley of S & M did make an honest and sincere attempt to perform the work that Risk requested. However, the record is devoid of any explanation for the $ 246,582 in notes that Risk assigned to Mrs. Pauley after Pauley died. Mel's singular efforts did not warrant such a level of compensation. Moreover, if it were truly intended that Pauley would be performing work having value in excess of $ 250,000, including his cash *676 payments, surely a written agreement could have been executed specifically describing what S & M was expected to do. In truth, there was no written agreement of any kind between S & M and the R&D Lab, or between Pauley and Risk. The purported licensing agreements were further examples of less than arm's-length dealings. Petitioners themselves had no contact with the purported licensees, New OSI or Megavision. Petitioners simply executed the licensing agreement that was a preprinted part of the promotional package. Actual dealings with the licensees, such as they were, were handled by Risk. New OSI, purported licensee for the VOG program was more form than substance. Risk maintained at trial that New OSI was a true entity operated first by Ronald Fairbairn and later by William Jackson. However, testimony given by Fairbairn and Jackson contradicted Risk's testimony. New OSI had no shareholders, no officers, no meetings, and no existence separate and apart from Risk himself. Under such circumstances, wherein Risk was representing both the investor-licensors and the purported licensee, the dealings cannot have been characterized to have been at arm's length. In the AMR program, *677 the licensee was an independent entity, even though Megavision's president was an employee of GRI. The difficulties presented by the licensing agreements were how and whether royalties would be paid to petitioners whose components were eliminated, and how compensation would be allocated for new components created during the development process. Failure to address such problems in the licensing provisions casts serious doubt on the arm's-length nature of the transaction. The royalty amounts stated in the licensing agreements and in the R&D Programs can best be described as problematic. The proposed royalties were stated in specific amounts per number of units sold without consideration for such variables as size of the unit (in the case of a window) or the format (goggles, helmet, and window). Viability of the licensing arrangements is rendered particularly questionable by Risk's testimony that he did not intend to supply petitioners with their information until petitioners satisfied their obligations as represented by the promissory notes. The notes were not due for seven years and payments until then were only out of proceeds from exploitation of the information. Petitioners *678 could not exploit the information if it was not in their possession. This Court notes that here the agreements provided no time schedule for performance of the research, and imposed no reporting requirements on the research entity. We note that time limits and reporting requirements would be expected in a legitimate R&D agreement to ensure that the research was performed properly and achieved results. The absence of such provisions is inconsistent with a true objective to seek a profit. This Court is further troubled by petitioners' failure to conduct an independent investigation prior to joining the respective ventures. There was no honest effort to obtain independent advice on structure, format, and prospects for the VOG and AMR ventures. Petitioners were willing to invest merely on the basis of information furnished by Dan Nickeson and or the other shelter salesmen. Such willing acceptance of a promoter's puffing would not be expected from any reasonably prudent investor. In Myslisz v. Commissioner, T.C. Memo. 1988-206, the taxpayers claimed deductions for alleged research and experimental expenditures incurred in a computer software development and leasing *679 program. The threshold question was whether they entered the program with an economic profit objective independent of the purported tax savings. This Court found such an objective absent. Among other considerations, we noted the taxpayers' failure to consult with independent sources prior to making their investments. Myslisz v. Commissioner, supra.The investors were expected to make reasonable inquiries concerning their investment transactions, including consultation with outside experts regarding the economics of the transactions, feasibility of the program, true value of the product, and procedures for marketing the product. Failure to seek such advice from independent sources tends to refute a bona fide profit objective. Myslisz v. Commissioner, supra.
Petitioners' inaction was irrational, unless it was the paper tax losses and not the real cash profits that petitioners sought. Here, the marketing efforts were to be advanced by New OSI (regarding the VOG) and Megavision (for the AMR). However, the purported arrangements with New OSI and Megavision were flawed given they lacked a reasonably designed approach for exploiting the *680 components once the R&D was complete. This Court has sometimes made a comparison between the revenue projections and the purported tax benefits. Avers v. Commissioner, T.C. Memo. 1988-176. The component schedules included in the R&D Programs included statements of the royalty income that would be earned on three estimated levels of sales activity. Similar statements about projected royalties were incorporated in the licensing agreements. However, these were bald sales projections purely hypothetical and unfounded, and were not justified or accompanied by an explanation. B. The Relationship Between the Purchase Price and Fair Market Value. Petitioners knew nothing about the actual value of the VOG and or AMR component at the time of acquisition. None of petitioners obtained an independent appraisal. Rather they relied completely on unsupported assertions of future profitability and stated value of individual components. The entire record makes it obvious that the stated purchase price for the VOG and or AMR component was illusory and far in excess of the actual value. C. Structure of the Financing. *681 The presence of deferred debt that is in substance or in fact not likely to be paid is an indication of a lack of economic substance. Knetsch v. United States, 364 U.S. 361 (1960); Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). We look to the substance and not the form of such debt. Waddell v. Commissioner, 86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988). Although the notes were in form recourse, no payments were required for seven years, except to the extent that gross proceeds from exploitation of the information were received. Moreover, the due date of the notes could be extended for three or six years upon payment of 10% or 20% of the principal balance. The notes had no commercial value and the R&D Labs could not have ever intended to collect them. The R&D Labs' belief that they were uncollectible is evidenced by assignments of $ 246,582 of the notes to Mrs. Pauley and $ 399,195 of the notes to William Jackson. Obviously, R&D Labs knew the notes lacked economic value or they would not have assigned such an exaggerated sum to these two individuals. Therefore, *682 the presence of such promissory notes indicates lack of economic substance. D. Perceived Congressional Intent. The fourth factor considered in Rose v. Commissioner, supra, examines the argument that petitioners were merely taking advantage of congressionally enacted tax incentives. We do not believe that the VOG and AMR ventures are the type of investment that Congress desired to encourage. While Congress may or may not wish to spur the production of VOGs and AMRs, it is inconceivable that Congress would endorse the true nature of the VOG and AMR component transactions, which was the naked sale of tax benefits. E. Conclusion. Using the Rose analysis it is evident that petitioners' acquisition of the VOG and or AMR components represents a generic tax shelter without economic substance. Because the transaction lacks economic substance, petitioners' deductions are improper. Because we resolve this question against petitioners, we need not address the alternative positions advanced by respondent. [8]
*683 The next issue for our decision is whether petitioners are liable for the addition to tax for negligence under section 6653(a) for 1978 and 1980, and additionally, whether petitioners are liable for the additions to tax for negligence under section 6653(a)(1) and (a)(2) for 1981, 1982, and 1983. Such additions to tax are imposed if any part of the underpayment of tax is due to negligence or intentional disregard of rules and regulations. Negligence, within the meaning of section 6653(a), constitutes a lack of due care, or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of proof to show that the Commissioner's determination on this issue is erroneous. Rule 142(a); Neely v. Commissioner, supra at 947. It is not necessary to repeat fully the analysis of petitioners' dealings previously set forth in order for us to conclude that the deficiencies attributable to the VOG and AMR ventures are due to negligence or intentional disregard of the rules and regulations. In purchasing the VOG and or AMR components, petitioners *684 paid little attention to the investment they were undertaking. They did not seek advice as to the propriety or financial merit of the investment. In addition, petitioners did not seek independent appraisals of the worth of those components. Petitioners' actions did not remotely approach the actions which reasonable and ordinarily prudent persons would have taken under the circumstances, especially in light of the amount of petitioners' respective investments. Accordingly, the additions to tax under section 6653(a) are fully justified, and respondent is sustained on this issue. For purposes of section 6653(a)(2) for the years 1981, 1982, and 1983, we hold that the entire underpayments attributable to the VOG and AMR ventures are due to negligence or intentional disregard of the rules and regulations. In his notices of deficiency to petitioners Bosse, Sharpe, Besheer, Nickeson, Kuhl, and Pugh respondent also determined an addition to tax under section 6661. The foregoing petitioners bear the burden of proof on this issue. Rule 142(a). In his respective answers, respondent affirmatively asserts the section 6661 addition as to petitioners James. Inasmuch as respondent raised *685 the issue in his answer, he bears the burden of proof in that docket. Section 6214(a); Rule 142(a); Parker v. Commissioner, 86 T.C. 547, 566 (1986). Section 6661 imposes an addition to tax if there is a substantial understatement of income tax. [9] An understatement is substantial when the understatement exceeds the greater of $ 5,000 or 10 percent of the amount of tax required to be shown on the return. The amount of the addition to tax under section 6661(a) is equal to 25 percent of any underpayment attributable to the substantial understatement. [10] Where an item is attributable to a tax shelter, [11] such as is involved here, the understatement is reduced by amounts attributable to the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, and the taxpayer reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment. Sec. 6661(b)(2)(C)(i)(II). *686 Petitioners contend that at the time their investment was made they entered into the VOG and or AMR venture with the requisite profit objective and that the research and development deductions claimed on petitioners' Schedules C are not "tax shelter" items. For the reasons stated above, we have found that the VOG and AMR ventures lacked economic substance and are not recognizable for tax purposes. See Knetsch v. United States, 364 U.S. 361 (1960); Higgins v. Smith, 308 U.S. 473 (1940); Gregory v. Helvering, 293 U.S. 465 (1935). Petitioners Bosse, Kuhl, Sharpe, Besheer, Nickeson and Pugh have not presented substantial authority for their position nor shown that they reasonably believed that the tax treatment they claimed was more likely than not the proper tax treatment and there is no basis to find that petitioners reasonably believed their tax treatment of the VOG and AMR venture investments was proper. Therefore, we sustain respondent's determination of the addition to tax under section 6661(a). Respondent bears the burden of proof in docket No. 20318-85 to show that petitioners James were unreasonable in their belief that *687 there was substantial authority for the tax treatment of the items of underpayment for purposes of section 6661. We hold that respondent has met his burden and sustain respondent's determination of the addition to tax under section 6661(a) as to petitioners James. The final issue for our decision is the additional interest imposed on tax motivated transactions by section 6621(c). [12]
In his notices of deficiency to petitioners Kuhl, Sharpe, Besheer, Pugh, and Evans, respondent determined that the increased rate of interest under section 6621(c) applies. Petitioners Kuhl, Sharpe, Besheer, Pugh, and Evans, bear the burden of proof on this issue. Rule 142(a). Pursuant to our Order, dated March 18, 1988, respondent was allowed to amend his answer *688 to request a determination of substantial underpayments attributable to tax motivated transactions within the meaning of section 6621(c) as to petitioners Brock, James, Bosse, and Nickeson. Because the claim was first asserted in the Amendment to Answer, respondent bears the burden of proof. Section 6214(a); Rule 142(a); Parker v. Commissioner, 86 T.C. 547, 566 (1986). Under section 6621(c)(1) the increased rate of interest is 120 percent of the statutory rate imposed on underpayments. A tax motivated transaction includes any valuation overstatement (as defined in section 6659) and any sham or fraudulent transaction. Sec. 6621(c)(3)(A)(i),(v). We have defined sham or fraudulent transactions to include transactions which were without economic substance. Patin v. Commissioner, 88 T.C. 1086 (1987), affd. sub nom. without published opinion Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. without published opinion Patin v. Commissioner, 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. *689 Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). We have disallowed the losses related to the research programs because they lacked economic substance and thus, the increased rate of interest applies to these items. Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989); Soriano v. Commissioner, 90 T.C. 44 (1988); Cherin v. Commissioner, 89 T.C. 986 (1987); Patin v. Commissioner, supra.
To reflect the foregoing, Decision will be entered for the respondent in docket Nos. 26201-86, 29998-86, and 34227-86. An order will be issued restoring for further trial or other disposition docket Nos. 20145-85, 20318-85, 21799-85, 866-86, 22413-86, and 21731-87. APPENDIX A
Docket No.
Petitioners
State
20145-85
Andrew Brock
Colorado
20318-85
Clifford H. James
Texas
Ora N. James
21799-85
Neal Bosse
Texas
Elizabeth A. Bosse
866-86
Norman E. Kuhl
Colorado
Nancy J. Kuhl
22413-86
James T. Sharpe
Texas
Marlene Sharpe
26201-86
Roy P. Besheer, Jr.
Texas
Shiela R. Besheer
29998-86
Daniel B. Nickeson
Colorado
Enid C. Nickeson
29998-86
Norman E. Kuhl
Colorado
Nancy J. Kuhl
34227-86
Steven T. Pugh
Colorado
Mary S. Pugh
21731-87
Sherman E. Evans
Colorado
Marjorie Evans
*690 Footnotes
1. Appendix A sets forth petitioners in these consolidated cases by docket number, name, and residence at the time their petitions were filed.↩
2. Co-petitioners William J. Kostka and Cynthia G. Kostka, docket No. 866-86, subsequent to trial filed a stipulation of settled issues with respondent thereby removing from our consideration the disposition of their case.↩
3. Unless otherwise indicated, all section numbers refer to the Internal Revenue Code in effect for the taxable years 1978, 1980, 1981, 1982, and 1983. Rule numbers refer to the Rules of Practice and Procedure of this Court.↩
4. § 6653(a)↩ is applicable for taxable years up to and including 1980. 5. § 6653(a)(1) and 6653(a)(2)↩ apply to taxable years 1981 through 1983. 6. § 6653(a)(2)↩ imposes an additional amount equal to 50 percent times the interest due on the part of the underpayment attributable solely to negligence.
*. 50 percent of the interest due on the underpayment of tax attributable to negligence or intentional disregard of rules or regulations. ↩
7. In the cases before us, the result under the section 183 analysis would be the same as under the Rose↩ economic substance analysis.
8. On brief, respondent argues that petitioners' expenditures cannot support deductions under section 174, petitioners were not at risk within the meaning of section 465 as to the recourse notes, and the VOG/AMR ventures are in substance partnerships and, therefore, are subject to the rules of partnership taxation.↩
9. An understatement occurs when the amount of tax shown on the return, less any rebate, is less than the amount of tax required to be shown on the return. See sec. 6661(b)(2)(A)↩. 10. See Pallottini v. Commissioner, 90 T.C. 498 (1988). In this case, respondent initially determined the addition based on 10% of the underpayment and subsequently sought a rate based upon 25% of the underpayment. Thus, we sustain the addition in the amount subsequently asserted by respondent, as we did in Pallottini↩. 11. Defined in sec. 6661(b)(2)(C)(ii)↩.
12. Prior to the Tax Reform Act of 1986 subsec. (c) was designated subsec. (d). Sec. 1511(c)(1)(A), Pub. L. 99-514, 100 Stat. 2085, 2744. The additional interest applies for periods after Dec. 31, 1984, notwithstanding that the transaction was entered into prior to that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005↩ (2d Cir. 1986).