**Daniel B. NICKESON and Enid C. Nickeson; Norman E. Kuhl and Nancy J. Kuhl, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 90–9007.

United States Court of Appeals, Tenth Circuit.

April 24, 1992.

---

Declan J. O'Donnell, Englewood, Colo., for petitioners-appellants.

Bridget M. Rowan, Attorney, Tax Div. (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen and Gilbert S. Rothenberg, Attorneys, Tax Div., with her on the brief), Dept. of Justice, Washington, D.C., for respondent-appellee.

Before LOGAN and SEYMOUR, Circuit Judges, and WINDER, District Judge.*

LOGAN, Circuit Judge.

Daniel B. and Enid C. Nickeson and Norman E. and Nancy J. Kuhl (taxpayers) appeal the decision of the United States Tax Court reported as *Brock v. Commissioner*, 58 T.C.M. (CCH) 826 (1989), which upheld the disallowance of deductions taken on taxpayers' 1982 returns for research and development expenses, the imposition of penalties under I.R.C. § 6661 for substantial understatement of tax and under I.R.C. § 6653(a) for negligence, and the imposition of the increased interest rate on the underpayment attributable to tax-motivated transactions under § 6621(b).

The primary issue on appeal is whether the Tax Court properly disallowed taxpayers' deductions of research and development expenses claimed under I.R.C. § 174(a). The deductions equalled the amount of money actually paid plus the face amount of promissory notes given in an agreement for purchase and development of components of an automatic meter reading device (AMR). A detailed exposition of the facts is contained in the Tax Court opinion. We recite here only the facts pertinent to this appeal.

The AMR program was promoted by George Risk, an inventor who had patented several inventions. He was also the principal in several corporations, including George Risk Industries, Inc. (GRI), manufacturer of computer keyboards and burglar alarm components, and G.R.I. Research and Development Laboratories (R & D Labs). Risk worked on improving the AMR throughout the 1970s, and although another entity, Harris Corporation, holds

---

* The Honorable David K. Winder, United States District Judge for the District of Utah, sitting by designation.

the patent on the improvements to the AMR, Risk negotiated to obtain a nonexclusive license to use eleven aspects of the patent. He did not have the right to sublicense, but could assign the licenses if the assignment was in connection with the sale of substantially the entire business.

In 1981, Risk began marketing the AMR by selling the individual aspects or components for a specified price, 25% in cash with the agreement requiring payment of the remainder in deferred promissory notes payable to R & D Labs. The offering documents emphasized the tax benefits of the transaction. The prospectus asserted a 100% return of investment cash paid through immediate tax benefits and a tax write-off equalling 400% of the initial cash payment. The purchase agreements did not provide a description of the research needed to develop the AMR to a marketable state, nor a time frame for the research. Moreover, there was no agreement for accounting to the taxpayers on progress or expenditures of funds.

The agreement gave the taxpayers the right to any technological information concerning the component they purchased, or possibly to information on the AMR as a whole. Thus, ostensibly the taxpayers could use the information to manufacture and sell their component, or they could sell the information to a licensee corporation created as part of the AMR project. It is significant, however, that the agreements did not provide transfer of ownership rights in the underlying technology.

After taking evidence for five days the Tax Court found that the taxpayers' investments in the AMR research and development program could not be the basis for any deduction. It also found that the additions to tax and increased interest rate were proper. We review the factual findings of the Tax Court under a clearly erroneous standard and its application of the law to those facts de novo. *Jackson v. Commissioner,* 864 F.2d 1521, 1524 (10th Cir.1989).

The Tax Court analyzed the AMR transaction using the two-step "generic tax shelter" and "economic substance" test from *Rose v. Commissioner,* 88 T.C. 386, 408–415 (1987), *aff'd,* 868 F.2d 851 (6th Cir. 1989), a test that emphasizes objective factors. The Tax Court first found that the AMR program manifested several characteristics, outlined in *Rose,* that established a generic tax shelter. Specifically, it found that

> The promotional materials focused on the tax benefits of the transaction; the demanded purchase price was accepted without negotiation; the right to commercially exploit the components was difficult to value in the abstract and the value placed on this right greatly exceeded the value of the components; the cost of producing the components was a fraction of the stated purchase price; and the bulk of the purchase price was deferred through the use of promissory notes which were nonrecourse in substance.

58 T.C.M. (CCH) at 834. The Tax Court then applied the test used in *Rose* to determine whether the investments were "devoid of economic substance." The factors examined included: "(1) the dealings between petitioners and the promoters; (2) the relationship between the sales price and the fair market value; (3) the structure of the financing; and (4) perceived congressional intent." 58 T.C.M. (CCH) at 834 (citing *Rose v. Commissioner,* 88 T.C. at 415–22). Applying these factors, the Tax Court found that the AMR transactions lacked economic substance, and that taxpayers entered the AMR transaction for tax benefits only, and not for profit.

## I

■ The *Rose* test[1] was developed to determine the validity of deductions and investment tax credits that require that a taxpayer's activities constituted *either* a "trade or business" *or* were undertaken for production of income. *See Rose v. Commissioner,* 868 F.2d 851, 853 (6th Cir.1989) (§ 167 depreciation deductions and

---

1. The Ninth Circuit upheld the Tax Court in its *Rose* decision but declined to adopt the generic tax shelter test. *See Rose v. Commissioner,* 868 F.2d 851, 853 (6th Cir.1989).

§ 48(a)(1) investment tax credits). The issue in the instant case, however, is the narrower question whether taxpayers were entitled to a § 174 deduction.

■ Congress provided under I.R.C. § 174(a)(1) that a taxpayer may deduct "research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business." As the statutory language indicates, research and experimental expenses are deductible only if they were incurred in connection with the taxpayer's trade or business. *See Diamond v. Commissioner,* 930 F.2d 372, 374 (4th Cir.1991); *Zink v. United States,* 929 F.2d 1015, 1021 (5th Cir.1991); *Levin v. Commissioner,* 832 F.2d 403, 405 (7th Cir.1987); *Independent Elec. Supply, Inc. v. Commissioner,* 781 F.2d 724, 726 (9th Cir.1986).

■ Whether a taxpayer incurred expenses in connection with his or her trade or business requires an initial inquiry into "whether the 'activity was undertaken or continued' in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." *Independent Elec. Supply,* 781 F.2d at 726 (quoting *Hirsch v. Commissioner,* 315 F.2d 731, 736 (9th Cir.1963)); *see also Agro Science Co. v. Commissioner,* 934 F.2d 573, 576 (5th Cir.) (deductions under § 174 allowable only if "the taxpayer made them primarily in furtherance of a bona fide profit objective *independent of tax consequences*" (emphasis added)), *cert. denied,* —— U.S. ——, 112 S.Ct. 300, 116 L.Ed.2d 243 (1991). Although the inquiry concerns the taxpayers' subjective intent, objective evidence may be used to establish that intent. *See Independent Elec. Supply,* 781 F.2d at 726. Taxpayers have the burden to show they had the requisite profit motive. *See*

*id.* at 727; *see also Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933) (taxpayer has burden of proving Commissioner wrong).

Taxpayers argue that in determining profit motive the Tax Court should not have applied the objective *Rose* test. The government responds that the *Rose* test is simply an application of factors that courts typically use to determine whether investments in activities asserted to be profit motivated were actually entered into for tax benefits. *See Collins v. Commissioner,* 857 F.2d 1383, 1385–86 (9th Cir.1988) (rejecting the *Rose* test as such but finding its analysis proper). We agree. In applying the broader "generic tax shelter" and "economic substance" tests, the Tax Court made the determination crucial to the instant case—whether the taxpayers had an actual and honest profit objective. *See Karr v. Commissioner,* 924 F.2d 1018, 1023 (11th Cir.1991) (court focused on substance of transaction to determine if transactions were sham), *cert. denied,* —— U.S. ——, 112 S.Ct. 992, 117 L.Ed.2d 153 (1992).

Courts have found the factors listed under Treas.Reg. § 1.183–2(b) pursuant to the § 183 hobby loss provision [2] helpful in determining good faith intent to realize a profit as required by § 174 and other code sections. *See, e.g., Independent Elec. Supply,* 781 F.2d at 726–27 (using factors to determine §§ 162, 167 and 174 deductibility); *Brannen v. Commissioner,* 722 F.2d 695, 704 (11th Cir.1984) (using factors to determine § 183 deductibility). In the instant case the Tax Court specifically stated, in applying the *Rose* test, that "[i]n the cases before us, the result under the section 183 analysis would be the same as under the *Rose* economic substance analy-

---

**2.** The factors are:
   1. The manner in which the taxpayer carries on the activity;
   2. The expertise of the taxpayer or his advisors;
   3. The time and effort expended by the taxpayer;
   4. The expectation that assets used in the business may appreciate in value;
   5. The success of the taxpayer in carrying on similar or dissimilar activities;
   6. The taxpayer's history of income or losses with respect to the activity;
   7. The amount of occasional profits, if any, which are earned;
   8. The financial status of the taxpayer; and
   9. Elements of personal pleasure or recreation.

*Independent Elec. Supply,* 781 F.2d at 726–27 (citing Treas.Reg. § 1.183–2(b) (1972)).

sis." 58 T.C.M. (CCH) at 834 n. 7. Although we believe that the § 183 factors are helpful in assessing subjective intent, *see Independent Elec. Supply,* 781 F.2d at 726; *Brannen,* 722 F.2d at 704, those factors are not exclusive; all of the unique circumstances of a case must be considered. *See* Treas.Reg. § 1.183–2(b); *Independent Elec. Supply,* 781 F.2d at 727.

Although each case is unique, a review of cases involving research and development programs and related types of activities reveals common components that courts rely on in rejecting taxpayers' deductions for lack of profit motive. These characteristics include, inter alia, marketing on the basis of projected tax benefits, *see, e.g., Karr,* 924 F.2d at 1024; *Independent Elec. Supply,* 781 F.2d at 727; grossly inflated purchase price set without bargaining, *see, e.g., Polakof v. Commissioner,* 820 F.2d 321, 324 & n. 5 (9th Cir.1987) (per curiam), *cert. denied,* 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988); *Independent Elec. Supply,* 781 F.2d at 727–28; *see also Karr,* 924 F.2d at 1024 (purchasers did not negotiate for price of shares in energy partnerships); failure of taxpayers to inquire into the potential profitability of the program, *see, e.g., Simon v. Commissioner,* 830 F.2d 499, 502–03 (3d Cir.1987) (deduction disallowed under § 162(a)); taxpayers' lack of control over activities, *see Diamond v. Commissioner,* 930 F.2d 372, 376 (4th Cir.1991) (taxpayers were at most passive investors rather than being engaged in a trade or business); and use of nonrecourse indebtedness, *see Independent Elec.,* 781 F.2d at 727. The Tax Court referred to precisely these types of facts in finding that taxpayers were not entitled to deductions for AMR expenditures.

The Tax Court found that:

(1) Petitioners had no independent appraisal of the AMR components; they relied on the information in the prospectus.

(2) The purchase price of the components was "illusory and far in excess of the actual value." 58 T.C.M. (CCH) at 836.

(3) The purchase agreement had no provision for reporting to purchasers on progress of research and no time schedule for the research.

(4) The AMR program was marketed as a tax shelter; the purchase agreement emphasized tax benefits rather than profit potential. *See* V.R. ex. 56–Z at 4 ("In addition to the 100% return of investment cash via tax benefits, a client could receive a royalty opportunity....").

(5) The agreement was vague to the point of being illusory; R & D Labs were not obligated to do anything.

(6) The structure of the AMR program, including sale of interests in individual components, was inconsistent with accepted research and development techniques.

(7) The licensee arrangement was questionable.

(8) The notes, which constituted 75% of the purchase price, were lacking in commercial value.[3]

We have reviewed the lengthy record, and it supports these findings. The Tax Court determined that taxpayers did not meet their burden to show they entered the AMR program with a good faith intent to profit;[4] rather, the AMR purchase agree-

---

**3.** The promissory notes were payable from and secured by the proceeds of the exploitation of the information from the research and development. Although the note terms seem to state that generation of information from the research and development would be used to pay off the notes, Risk testified that no information was to be provided to investors until the notes were paid off. As the government has argued, this arrangement suggests that the notes probably were not enforceable.

**4.** Taxpayers in their brief argue that the trial court overlooked facts such as that the "unre-

butted value of the AMR R & D effort was $913,000.00." III R. 221. We note there was also testimony that the research cost could have been $100,000, and testimony that there was actually very little research done on the AMR. Taxpayers also assert that GRI had the resources to perform the research, and taxpayers gained rights to technology resulting from any research. In any case, the issue is not whether any research was performed or the value of it; the issue is the intent of the taxpayers in incurring the expenses they seek to deduct.

ment was "the naked sale of tax benefits." 58 T.C.M. (CCH) at 836.

## II

We have discussed above whether taxpayers had an actual and honest profit objective in order to treat the Tax Court's analysis and the parties' principal arguments. But we believe there is a clearer and simpler basis for denying taxpayers' claimed deductions. To establish that claimed § 174 expenses were in connection with their trade or business, taxpayers must show both a profit motive and that their activities were substantial and regular enough to establish that they were actively involved in the trade or business. *E.g., Zink v. United States,* 929 F.2d 1015, 1021 (5th Cir.1991); *see also Higgins v. Commissioner,* 312 U.S. 212, 218, 61 S.Ct. 475, 478, 85 L.Ed. 783 (1941) (to determine whether taxpayers are carrying on a business, must consider taxpayers' activities); *Snyder v. United States,* 674 F.2d 1359, 1364 (10th Cir.1982) (discussing trade or business under § 162). Because the Tax Court found that taxpayers had no non-tax profit motive, it did not focus on whether taxpayers were actively involved in the AMR as a trade or business or whether they were merely passive investors in the project. Its findings indicate, however, that taxpayers' activities never went beyond those of passive investors. *See Zink,* 929 F.2d at 1022; *see also Levin v. Commissioner,* 832 F.2d 403, 406 (7th Cir.1987) (passive investors do not qualify under § 174); *Diamond v. Commissioner,* 930 F.2d 372, 376 (4th Cir.1991) (lack of control over activities indicates taxpayers were at best investors and *not* engaged in a trade or business).

Taxpayers rely upon the holding of *Snow v. Commissioner,* 416 U.S. 500, 94 S.Ct. 1876, 40 L.Ed.2d 336 (1974), that a taxpayer developing but not yet producing or selling a product can take the § 174 deduction. The *Snow* opinion pointed out that the intention of Congress in enacting § 174 was to encourage start-up ventures. *See Snow,* 416 U.S. at 503–04, 94 S.Ct. at 1878–79 (holding that limited partner in partnership formed to develop incinerator was entitled

to § 174 deduction although no sales were made in relevant tax year). Taxpayers further point out that § 174 applies "not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by him but also to expenditures paid or incurred for research or experimentation *carried on in his behalf by another person or organization.*" Treas. Reg. § 1.174–2(a)(2) (emphasis added). The plain language of the statute, however, requires that a taxpayer incur the expenses in connection with his or her trade or business. *See* § 174(a); *see also United Fibertech, Ltd. v. Commissioner,* 62 T.C.M. (CCH) 699 (1991) (*Snow* did not eliminate requirement that claimed § 174 expenditure be in connection with trade or business); *Levin,* 832 F.2d at 405. We agree with the Tax Court that taxpayers' deductions were properly denied.

## III

Taxpayers also appeal the Tax Court's finding sustaining the § 6661 penalty for substantial understatement of tax, the § 6653(a) penalty for negligence, and the § 6621(c) increased interest rate for underpayment attributable to tax-motivated transactions. We affirm on those issues for substantially the reasons stated in the Tax Court opinion, 58 T.C.M. (CCH) at 837–38.

AFFIRMED.