# United States Court of Appeals for the Federal Circuit

---

**AMPERSAND CHOWCHILLA BIOMASS, LLC, MERCED POWER, LLC,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2021-1385

---

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00841-MCW, Senior Judge Mary Ellen Coster Williams.

---

Decided:  February 24, 2022

---

STEPHEN G. LEATHAM, Heurlin, Potter, Jahn, Leatham, Holtmann & Stoker, P.S., Vancouver, WA, argued for plaintiffs-appellants.

CLINT A. CARPENTER, Appellate Section, Tax Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by BRUCE R. ELLISEN, DAVID A. HUBBERT.

---

Before NEWMAN, HUGHES, and STOLL, *Circuit Judges*.

HUGHES, *Circuit Judge*.

This is a tax case. Ampersand Chowchilla Biomass, LLC and Merced Power, LLC appeal a decision of the Court of Federal Claims denying their request for additional payments of Section 1603 grants under the American Recovery and Reinvestment Act of 2009. Because we agree with the Court of Federal Claims that the relevant power facilities did not meet the requirements of the statute, we affirm.

I

A

In 2007, California Biomass Fund I, LLC (CalBio) acquired two defunct facilities and began restoring them and upgrading them to biomass facilities, expecting the facilities to be operational in 2008.

Before CalBio acquired the facilities, Pacific Gas & Electric Company had entered into power-purchase agreements with the facilities' previous owner. PG&E had agreed to purchase electricity when (1) the facilities achieved commercial operations and passed initial capacity tests, (2) PG&E received performance-assurance payments, and (3) the facilities received approval from the California Public Utilities Commission. CalBio assumed these power-purchase agreements, and CalBio and PG&E later amended the agreements to loosen their requirements. CalBio and PG&E also entered into interconnection agreements that required the facilities to pass pre-parallel testing, which ensures that the facilities can operate at the same frequency and in the same phase as the transmission grid so that the facilities do not damage the grid.

While renovating in 2007, CalBio secured Authority to Construct permits for the facilities. These permits allowed construction on the facilities and allowed the facilities to generate and sell electricity. The Authority to Construct permits could be converted into Permits to Operate after the facilities met certain conditions, like emissions tests.

Biomass facilities, though, often have some difficulty passing environmental tests. So instead of shutting down biomass facilities at the first sign of noncompliance—which could lead to agricultural waste being burned in open fields, causing more environmental pollution—the San Joaquin Valley Air Pollution Control District has a Notice of Violation process in which the District fines and oversees noncompliant facilities until they are brought back into compliance.

The Chowchilla and Merced facilities had their "initial fires" in April and July 2008, respectively. CalBio labeled the facilities "in operation" as of May 15, 2008 and August 23, 2008. And the facilities passed pre-parallel testing under the PG&E interconnection agreements on June 17, 2008 and August 24, 2008.

Following these events, the facilities began selling electricity on the spot market. On December 12, 2008, Chowchilla met the requirements under its power-purchase agreement and accordingly started selling its electricity exclusively to PG&E. Although Merced did not start selling its electricity exclusively to PG&E until February 21, 2009, the parties recognized that Merced had met the requirements under its power-purchase agreement based on data from the third and fourth quarters of 2008.

From May 15, 2008 until the end of that year, the Chowchilla facility operated at 34.1% of its rated capacity, generating 20,553 MWh of electricity and $1,408,941 in revenue. And from August 23, 2008 through the end of 2008, the Merced facility operated at 42.1% capacity, generating 14,306 MWh of electricity and $851,152 in revenue. The facilities operated fairly continuously throughout 2009, during which the Chowchilla facility operated at 53.9% capacity and the Merced facility operated at 51.2% capacity. The facilities occasionally were noncompliant with emissions regulations, but the District allowed the

facilities to continue operating and never revoked their Authority to Construct permits.

B

In 2009, Congress passed the American Recovery and Reinvestment Act "[t]o assist those most impacted by the [2008] recession." American Recovery and Reinvestment Act of 2009 (ARRA), Pub. L. No. 111-5, § 3(a), 123 Stat. 115, 115–16. Stated purposes of this statute were "[t]o provide investments needed to increase economic efficiency" and invest in "environmental protection[] and other infrastructure that will provide long-term economic benefits." *Id.* One provision allowed entities to receive federal grants if they "placed in service" a renewable energy facility during 2009 or 2010 or if they began constructing property in 2009 or 2010 that they later placed in service before the relevant credit-termination date. *Id.* § 1603(a)(1)–(2), 123 Stat. at 364–66. The government intended that these "Section 1603" grants would "increase investment in domestic clean energy production" by "reimburs[ing] eligible applicants for a portion of the cost of installing the specified energy property." *See* U.S. Dep't of Treas., *1603 Program: Payments for Specified Energy Property in Lieu of Tax Credits*, https://home.treasury.gov/policy-issues/financial-markets-financial-institutions-and-fiscal-service/1603-program-payments-for-specified-energy-property-in-lieu-of-tax-credits (last visited Jan. 18, 2022).

CalBio was experiencing financial difficulties at that time, so it investigated whether it could apply for Section 1603 grants for the Chowchilla and Merced facilities. CalBio ultimately concluded that it could not apply for Section 1603 grants because its facilities had been placed in service in 2008, outside of the statute's required period. Finding no resolution to its continuing financial problems, CalBio suspended operations in June 2010 and decided to sell the facilities.

On December 28, 2010, Akeida Environmental Fund LP acquired the facilities. Akeida spent nearly $15 million improving the facilities, which passed emissions tests in August 2011. In October 2011, Akeida applied for Section 1603 grants, claiming that the facilities were placed in service when Akeida's emissions improvements were certified on August 11, 2011.

Akeida requested a $12 million grant for each facility. The United States Department of Treasury largely rejected Akeida's claims because, according to Treasury, most of the property had been placed in service in 2008. Instead, Treasury granted only $1.1 million for each facility, awarded for the additional property that was eligible based on the date Akeida placed it in service.

Appellants, the direct owners of the two facilities and subsidiaries of Akeida, sued in the Court of Federal Claims for the remainder. The Court of Federal Claims held for the government, agreeing that the facilities were placed in service in 2008.

In its two-part analysis, the Court of Federal Claims applied Treasury's regulatory definition of "placed in service," which required it to determine the "taxable year in which the property is . . . availabil[e] for a specifically assigned function." Treas. Reg. § 1.46-3(d)(1)(ii). First, the Court of Federal Claims ascertained the facilities' "specifically assigned function." Appellants asserted that the facilities' specifically assigned function is "to produce electricity on a baseload basis for sale to PG&E at the quantities required under the [power-purchase agreements], reliably, and in compliance with applicable law." *Ampersand Chowchilla Biomass, LLC v. United States*, 150 Fed. Cl. 620, 643–44 (2020). The Court of Federal Claims disagreed and found that the facilities' specifically assigned function is simply "to produce and sell electricity." *Id.* at 644.

Second, the Court of Federal Claims evaluated five factors—drawn from the IRS's published revenue rulings and

formally established in *Oglethorpe Power Corp. v. Comm'r*, 60 T.C.M. (CCH) 850 (1990)—to determine when the facilities achieved their specifically assigned function and were therefore "placed in service." The Court of Federal Claims found that all five factors indicated that the facilities were placed in service in 2008. Therefore, the Court of Federal Claims concluded that Akeida was not owed the money that it claimed because its property was placed in service outside of the statute's designated time period.

Chowchilla and Merced appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II

We review the Court of Federal Claims' conclusions of law, including statutory interpretations, de novo and its findings of fact for clear error. *Bd. of Cnty. Supervisors v. United States*, 276 F.3d 1359, 1363 (Fed. Cir. 2002); *WestRock Va. Corp. v. United States*, 941 F.3d 1315, 1318 (Fed. Cir. 2019). The Court of Federal Claims' conclusions about the facilities' specifically assigned function and the year they were placed in service are questions of fact. *See Armstrong World Indus., Inc. v. Comm'r*, 974 F.2d 422, 429–30 (3d Cir. 1992).

## A

We review de novo the Court of Federal Claims' conclusion that the applicable statute and corresponding regulation do not require facilities to produce power at ideal or near-ideal production levels to be placed in service. In making this determination, the Court of Federal Claims relied largely on *Sealy Power Ltd. v. Commissioner*, 46 F.3d 382 (5th Cir. 1995). Appellants request that we reject the Fifth Circuit's analysis in *Sealy*, labeling it an "outlier" and asserting that "courts have consistently rejected this standard for power plants and repeatedly required a far higher standard" than merely "generating and selling power." Appellant's Br. 22, 29.

We agree with the trial court's decision and the Fifth Circuit's *Sealy* opinion: to be placed in service, a facility need not achieve ideal or near-ideal production levels.

The statute at issue here states in relevant part:

> [T]he Secretary of the Treasury shall . . . provide a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property . . . .

ARRA, Pub. L. No. 111-5, § 1603, 123 Stat. 115, 364–66 (adding a note to 26 U.S.C. § 48) (now expired). Treasury defines "placed in service"—as used in a separate but related statute[1]—via regulation:

> [P]roperty shall be considered placed in service in . . . [t]he taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function . . . .

Treas. Reg. § 1.46-3(d)(1)(ii). Based on their plain language, we conclude that neither the statute nor the regulation "states []or implies that the property must produce an anticipated or projected amount before it may be considered ready and available for a specifically assigned function." *Sealy*, 46 F.3d at 394.

---

[1]    This regulation limits itself to "purposes of the credit allowed by" 26 U.S.C. § 38. Treas. Reg. § 1.46-3(d)(1). But "[g]enerally, 'identical words used in different parts of the same statute are . . . presumed to have the same meaning.'" *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 86 (2006) (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005)). And the Court of Federal Claims' decision and the parties' briefs invoke this regulation, so we apply it here. Even if it were not applicable, our conclusion would be the same.

In fact, the regulations' examples of property that is placed in service suggest the opposite. One example concerns operational farm equipment that is impracticable to use, and therefore is not used, in the year it is purchased. Treas. Reg. § 1.46-3(d)(2)(ii). Despite the farm equipment's non-use, it is still "placed in service" in the year of purchase. *Id.* This example implies that the farm does not need to produce crops near its expected levels (i.e., the levels that the farm would achieve if it used its new equipment) for the equipment to be placed in service. *See Sealy*, 46 F.3d at 394.

A second example explicitly acknowledges deficient performance, classifying equipment that "is operational but is undergoing testing to eliminate any defects" as "placed in service." Treas. Reg. § 1.46-3(d)(2)(iii); *see Sealy*, 46 F.3d at 394.

And although we do not rely on legislative history to reach our conclusion, we note that Congress enacted the legislation to "promote economic recovery" in light of the 2008 recession and "[t]o invest in . . . infrastructure that will provide long-term economic benefits." ARRA, Pub. L. No. 111-5, § 3(a), 123 Stat. 115, 115–16. Like the tax credits in *Sealy*, Section 1603 grants "provide[d] an incentive to acquire property such as machinery and equipment by lowering the effective after-tax acquisition cost of the qualified property," "lower[ing] the profit risk that these firms faced in starting out a new venture and therefore [facilitating] their investment decisions." 46 F.3d at 393–94. By incentivizing this "initial investment decision," the statute suggests that the placed-in-service inquiry is primarily focused on getting a facility online. Reading the statute to strictly require "achieving ideal or near ideal production levels . . . demands a hindsight approach to the success of a taxpayer's investment expenditures which undermines the very focus of" this objective. *Id.* at 394.

The statute and regulation simply do not require the strict construction for which Appellants ask. Therefore, we agree with the Court of Federal Claims' statutory interpretation and hold that a specifically assigned function need not require ideal or near-ideal production levels.

B

Next, we review for clear error the Court of Federal Claims' finding that the facilities' specifically assigned function is to produce and sell electricity.

The Court of Federal Claims considered Appellants' assertion that the facilities' specifically assigned function is "to produce electricity on a baseload basis for sale to PG&E at the quantities required under the [power-purchase agreements], reliably, and in compliance with applicable law." *Ampersand*, 150 Fed. Cl. at 643–44. The Court of Federal Claims recognized that the power-purchase agreements "were the cornerstone of the Facilities' functioning" but also found them "not as rigid or inflexible as [Appellants] portray[ed] them to be." *Id.* at 644. In fact, PG&E had amended the power-purchase agreements several times, and "Akeida was aware . . . that PG&E was not demanding performance at the stated capacity levels and was willing to waive or reduce performance penalties." *Id.* at 645. The Court of Federal Claims concluded that "the parties' course of dealing under the [power-purchase agreements] evinces a flexible contractual relationship permitting less than consistent baseload production." *Id.*

The Court of Federal Claims also rejected Appellants' suggestion that the facilities had to operate in accordance with environmental laws and regulations. *Id.* The trial court determined that "[a]chieving compliance with environmental law was not part and parcel of the Facilities' function to produce electricity using biomass." *Id.* And the trial court further found that even when the facilities did not comply with environmental laws, their continued operation still prevented "burning waste in open fields—a

circumstance local environmental authorities viewed as more problematic than operating with emissions violations." *Id.* at 646. These findings were not clearly erroneous.

On appeal, Appellants make largely the same arguments, asserting that the trial court chose to overlook whether the facilities were operating in compliance with applicable law and that the *original* power-purchase agreements, not the amended versions, should dictate the facilities' specifically assigned function. The trial court's finding that the facilities' intended use did not include operating at 90 to 95% capacity or any of the other stringent requirements for which Appellants advocate is not clearly erroneous. Evidence in the record supports the trial court's conclusion. A December 2007 contract specified that the contractor was to refurbish the facilities "so as to return their respective 12.5 MW units to full service *for the purpose of generating electricity for sale.*" *Id.* at 625 (emphasis added) (quoting Appx5748). The Court of Federal Claims did not clearly err in rejecting Appellants' arguments or finding that the facilities' specifically assigned function is to produce and sell electricity, so we affirm its finding.

C

Finally, we review for clear error the Court of Federal Claims' factual findings as to the five-factor test used to determine when a facility achieves its specifically assigned function and is therefore placed in service. The five factors the court weighs are

1. "whether the necessary permits . . . for operation have been obtained,"

2. "whether critical preoperational testing has been completed,"

3. "whether the taxpayer has control of the facility,"

4. "whether the unit has been synchronized with the transmission grid," and

5. "whether daily or regular operation has begun."

*Sealy*, 46 F.3d at 395; *Ampersand*, 150 Fed. Cl. at 646 (citing *Oglethorpe Power Corp. v. Comm'r*, 60 T.C.M. (CCH) 850 (1990)).

Appellants contest the trial court's findings only for factors one, two, and five.

At factor one, the Court of Federal Claims found that "the only permit necessary to begin generating power was an" Authority to Construct permit. *Ampersand*, 150 Fed. Cl. at 647. The Court of Federal Claims further found that the Authority to Construct permits "were the only permits necessary for the Facilities to begin producing electricity under the" power-purchase agreements. *Id.* Because the Chowchilla facility received its Authority to Construct permit on April 19, 2007 and Merced received its Authority to Construct permit on February 3, 2007, the Court of Federal Claims concluded that the facilities had obtained their necessary permits for operation by 2008. *Id.*

Appellants dispute that conclusion, asserting that, in 2008, their facilities often did not comply with the local and federal environmental requirements in the Authority to Construct permits. The Court of Federal Claims rejected this argument, finding that "violations were a fact of life for biomass plants at that time." *Id.* The trial court also emphasized that the District never revoked Appellants' Authority to Construct permits, "permitting them to operate in the face of" Notices of Violation because continued operations were "environmentally preferable to shutting down the Facilities and having agricultural and wood waste burned in open fields." *Id.*

The Court of Federal Claims did not clearly err in its analysis of factor one. Appellants' Authority to Construct

permits allowed them to operate the facilities by producing and selling electricity. While the facilities occasionally went out of compliance, the District never revoked Appellants' permits and allowed the facilities to continue operating.

At factor two, the Court of Federal Claims first determined what constituted "critical testing." *Id.* at 647–48. Appellants argued that environmental tests were critical, but the Court of Federal Claims disagreed, finding that Appellants had "overstate[d] the role that environmental compliance and testing have in the placed-in-service analysis." *Id.* at 648. Especially because "in California, a biomass facility's noncompliance with emissions requirements d[oes] not prevent that facility from being ready and available to perform its specifically assigned function of generating and selling electricity." *Id.* The Court of Federal Claims also relied on the government's expert in engineering, plant operations, and testing, Mr. Filsinger, to find that "environmental tests required by the [Authority to Construct permits] were not critical, given that environmental compliance for a biomass facility was always 'difficult.'" *Id.*

The Court of Federal Claims therefore concluded that the critical tests were (1) pre-parallel testing and (2) testing required under the power-purchase agreements. *Id.* And because the facilities passed these tests by 2008, the trial court concluded that the facilities had passed the critical tests necessary for proper operations by 2008. *Id.*

The Court of Federal Claims did not clearly err in its analysis of factor two. The facilities could and did operate without passing environmental tests, and the facilities passed all pre-parallel testing and the testing required by the power-purchase agreements by 2008, allowing them to generate and sell electricity starting that year.

At factor five, the Court of Federal Claims pointed out "that the Facilities were generating and selling electricity in 2008, and that they generated revenue of $2,260,093

that year." *Id.* And although the facilities operated below the capacity required by the original power-purchase agreements, "PG&E accepted this level of performance, amend[ing] the [power-purchase agreements] to waive or reduce performance penalties, and continued to work with CalBio to keep the Facilities operational." *Id.* at 649.

The Court of Federal Claims did not clearly err in its analysis of factor five. The facilities were generating and selling a substantial amount of electricity in 2008. While the facilities occasionally shut down, the Court of Federal Claims did not clearly err in finding that they nonetheless operated regularly.

Therefore, the Court of Federal Claims did not clearly err in finding that all five factors indicate that the facilities were placed in service in 2008. We accordingly affirm.

### III

We have considered Appellants' other arguments but find them unpersuasive or unnecessary to reach. For the reasons above, we affirm the Court of Federal Claims' decision.

**AFFIRMED**