FILED
United States Court of
Appeals
Tenth Circuit

November 4, 2022

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

PRESTON OLSEN; ELIZABETH
OLSEN,

       Petitioners - Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE,

       Respondent - Appellee.

No. 21-9005

_____

**Appeal from the United States Tax Court**
**(CIR No. 26469-14 & No. 21247-16)**
_____

Paul W. Jones, Hale & Wood, LLP, Salt Lake City, Utah, for Petitioners-
Appellants.

Robert J. Branman, Attorney, U.S. Department of Justice, Tax Division
(David A. Hubbert, Deputy Assistant Attorney General, and Joan I.
Oppenheimer, Attorney, with him on the brief), Washington, D.C., for
Respondent-Appellee.
_____

Before **HARTZ**, **BACHARACH**, and **EID**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

      This appeal addresses the denial of tax benefits relating to Mr.

Preston Olsen's purchases of solar lenses. These benefits are available only

if the taxpayer has a profit motive for the purchases. Applying this requirement, the tax court disallowed tax benefits in part because Mr. Olsen had lacked a profit motive.[1] In our view, the tax court did not err in rejecting a profit motive, so we affirm.

## I.    Mr. Olsen enters into a lens-sale-and-leaseback transaction with Mr. Neldon Johnson's enterprise.

Mr. Olsen bought the lenses in 2009, 2011, 2012, 2013, and 2014, through a program created by Mr. Neldon Johnson. Under the program, Mr. Johnson would use the lenses in a new system to generate electricity by heating a liquid to generate steam and drive a turbine.

Mr. Johnson never finished the system. He did build nineteen test towers by 2006. Nine years later, though, he had completed the lenses on only one tower and hadn't decided whether those lenses would heat water, oil, or molten salt.

Mr. Johnson funded the program through investors like Mr. Olsen. The investors bought lenses from Mr. Johnson's companies (at first International Automated Systems, Inc. and later RaPower3, LLC) and leased the lenses to another of Mr. Johnson's companies (LTB).

---

[1]    Mr. Olsen and his spouse filed joint tax returns, so both Mr. and Mrs. Olsen petitioned the tax court and appealed the tax court's ruling. But the parties agree that Mr. Olsen had acted alone in buying the lenses, so we discuss his motive rather than Mrs. Olsen's.

Under the leases, LTB promised to place the lenses in service and to operate them. Once the system began producing revenue, LTB would pay Mr. Olsen's company (PFO Solar, LLC) $150 per lens per year.

Based on this arrangement, Mr. Olsen's company made a down payment of 30% of the lens price. The rest of the price would be due in installments starting five years after the system started producing revenue.[2] But the system never generated any revenue.

---

[2]    The tax court said that the obligation to pay more would be triggered by the generation of *electricity*, not *revenue*. But the trigger for other payments involved the production of revenue rather than electricity.

II.     **The Olsens claim depreciation deductions and solar energy credits.**

From 2009 to 2014, the Olsens annually claimed depreciation deductions and solar energy credits. The depreciation deduction recognizes that business property declines in value through wear and tear, obsolescence, or exhaustion. I.R.C. § 167(c)(1). To compensate for a decline in value, the taxpayer can deduct losses from the amount of taxable income. I.R.C. § 167(a). A solar energy credit also exists, allowing a credit equaling 30% of the basis for qualifying equipment that "uses solar energy to generate electricity." I.R.C. § 48(a)(3)(A).

From 2009 to 2014, the Olsens reported wages of $140,000 to $183,000. To offset these wages, the Olsens claimed depreciation deductions and solar energy credits based on the full price of the lenses, rather than the 30% that Mr. Olsen's company had paid. *See* Part I, above.



4

These claims allowed the Olsens to pay little or no federal income taxes.[3] So the Olsens came out ahead even though they had never obtained any money from the leases.

## III.   The IRS and the tax court disallow the tax benefits, and we apply dual standards over the legal conclusions and factual findings.

The IRS issued notices of deficiency, disallowing the deductions and solar energy credits that the Olsens had claimed from 2010 to 2014. The Olsens challenged the deficiency notices. For this challenge, the Olsens needed to show a right to the deductions and credits. T.C. R. 142(a). The tax court found the showing insufficient, and the Olsens appeal.

In deciding this appeal, we apply the same standards governing review of a civil bench trial. I.R.C. § 7482(a)(1). For the tax court's legal conclusions, we conduct de novo review; for the factual findings, we apply the clear-error standard. *Petersen v. Comm'r*, 924 F.3d 1111, 1114 (10th Cir. 2019).

## IV.   The Olsens had no right to deductions for depreciation based on the absence of a profit motive.

For the depreciation deductions, the Olsens bore the burden of proof. *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992). To satisfy this burden, the Olsens needed to show that Mr. Olsen had bought the solar lenses to

---

[3]     From 2009 through 2013, the Olsens paid no federal income taxes. In 2014, the Olsens paid $1,538 in federal income taxes on $183,344 of wages—an effective tax rate of 0.8%.

make a profit. *See* I.R.C. §§ 167(a), 183. The tax court did not clearly err in rejecting the existence of a profit motive, so we affirm the tax court's disallowance of depreciation deductions.[4]

The need for a profit motive comes from the text of the tax code. Under the code, a taxpayer may claim a depreciation deduction only if the property is "used in the trade or business" or "held for the production of income." I.R.C. § 167(a)(1), (2). Property is used in a trade or business or held for the production of income only if the taxpayer has a profit motive. *See Wiles v. United States*, 312 F.2d 574, 576 (10th Cir. 1962) (using property in a trade or business); *Cannon v. Comm'r*, 949 F.2d 345, 348 & n.2 (10th Cir. 1991) (holding property for the production of income); *see also* I.R.C. § 183(a) (requiring that a taxpayer engage in an activity for profit to justify a deduction for that activity). An incidental profit motive is not enough; the Olsens needed to show that "profit [had been] the dominant or primary objective of the venture." *Cannon*, 949 F.2d at 350.

Applying this standard, the tax court found that the Olsens had not shown a profit motive. This finding was factual, so we apply the clear-error standard. *Id.* at 349. This standard is deferential: Even if we would

---

[4]    The tax court also found that Mr. Olsen had not placed the solar lenses in service or operated the business with regularity or continuity. We need not address these findings because the Olsens would not be entitled to the tax benefits even if Mr. Olsen had placed the lenses in service and operated the business with regularity and continuity.

have arrived at a different finding, we must affirm if the tax court's "account of the evidence is plausible in light of the record viewed in its entirety." *Id.* (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985)). The Olsens have not shown clear error.

The tax court must gauge a taxpayer's intent based on "the unique circumstances of a case." *Nickeson v. Comm'r*, 962 F.2d 973, 977 (10th Cir. 1992). Although the taxpayer's intent involves a subjective question, the tax court should give "greater weight . . . to objective facts than to the taxpayer's mere statement of his intent." Treas. Reg. § 1.183-2(a); *accord Cannon*, 949 F.2d at 351 n.8 ("[A] taxpayer's statement of intent is given less weight than objective factors in determining such intent.").

We have used two sets of factors to assess the taxpayer's intent:

1.   the nine nonexclusive factors listed in Treasury Regulation § 1.183–2(b), *Cannon*, 949 F.2d at 350, and

2.   five signs that the taxpayer lacks a profit motive, *Nickeson*, 962 F.2d at 977.

But "each case is unique," and neither set of factors is exclusive; so the tax court must consider "all of the unique circumstances of a case." *Id.*

In considering these circumstances, the tax court probed the relevant factors and found no profit motive.

**1.    Nine Factors in the Treasury Regulation**

In reviewing this finding, we consider the Treasury Regulation's nine non-exclusive factors.

7

*1. The "[m]anner in which the taxpayer carries on the activity."*

*Treas. Reg. 1.183-2(b)(1).* The tax court found that Mr. Olsen had not

conducted the activity in a business-like manner, observing that

- the entity owning the lenses had lacked substantial business records, a separate bank account, a business plan, or a marketing strategy, and

- the lessee (LTB) hadn't signed any of the lease agreements or made any lease payments.

We can consider not only these observations, but also the purchase

agreements in 2012, 2013, and 2014. All of these agreements contained

deadlines that had already passed at the time of signing. And Mr. Olsen

kept buying lenses for three years after commenting that the seller's "stuff

always look[ed] a little like junk." Appellants' App'x vol. 3, at 751

(Jan. 10, 2012 email from Mr. Olsen to his sister); *see* p. 11, below.

Despite this evidence, the Olsens point to Mr. Olsen's efforts to

manage the business (such as registering his limited liability company,

using that entity to buy the lenses, and tracking his agreements). But the

Olsens can't base clear error on their disagreement with the tax court's

weighing of evidence. *Anderson v. Bessemer City*, 470 U.S. 564, 573–74

(1985). We thus conclude that the tax court didn't clearly err by weighing

this factor against the Olsens.

*2. "The expertise of the taxpayer or his advisors." Treas. Reg.*

*§ 1.183-2(b)(2).* The tax court found that this factor weighed against a

8

profit motive because Mr. Olsen (1) had lacked expertise in solar energy or equipment leasing and (2) hadn't consulted experts in solar energy or equipment leasing.

The Olsens challenge this finding, arguing that Mr. Olsen (1) used the internet to research the science underlying the lenses and (2) consulted his sister, who was a chemistry professor. But this regulatory factor calls for extensive study or consultation of experts in the field. Treas. Reg. § 1.183-2(b)(2). The tax court didn't clearly err by requiring more of Mr. Olsen than basic internet research and consultation with a chemistry professor. *See Westbrook v. Comm'r*, 68 F.3d 868, 878 (5th Cir. 1995) (applying this factor against the taxpayers, despite their consultation of experts in the industry's scientific and technical aspects, based on the failure to "seek expert advice regarding the economic or business aspects").

The Olsens also point to Mr. Olsen's testimony that he had monitored the project through quarterly visits to the site. But the tax court discounted that testimony, noting that Mr. Olsen had "maintained no travel logs and documented no travel expenses," Appellants' App'x vol. 9, at 2185; and the Olsens don't say how we can reject this credibility determination. So the tax court didn't clearly err by weighing this factor against the Olsens. *See United States v. Apperson*, 441 F.3d 1162, 1195 (10th Cir. 2006) (noting that an appellant had not explained how the district court had erred

9

and had thus "failed to sufficiently place [the] rulings at issue"); *see also* pp. 11–12, below.

3.     *"The time and effort expended by the taxpayer in carrying on the activity." Treas. Reg. § 1.183-2(b)(3).* The tax court found that Mr. Olsen hadn't spent much time on the business based on

- an observation that Mr. Olsen had visited the site only "once or twice" over five years and

- his concession "that his [business] activities [had been] limited to" writing annual checks to buy lenses, renewing the limited liability company each year, maintaining copies of the agreements, and deciding annually how many lenses to buy.

Appellants' App'x vol. 9, at 2204. With this observation and concession, the tax court pointed out that the promoters had assured Mr. Olsen of his freedom "to work as little . . . as he would like in his solar business." *Id.* at 2197.

Despite that assurance, the Olsens insist that Mr. Olsen spent "substantial" time on his lens business. But the Olsens don't discuss the tax court's reasoning or conclusion. With no such discussion, we see no clear error in the district court's finding as to Mr. Olsen's time and effort. *See United States v. Apperson*, 441 F.3d 1162, 1195 (10th Cir. 2006) (noting that an appellant didn't adequately challenge the rulings, relying on a failure to explain how the district court had erred); *see also* pp. 9–10, above.

10

*4. The "[e]xpectation that assets used in [the] activity may appreciate in value." Treas. Reg. § 1.183-2(b)(4).* The tax court found that Mr. Olsen hadn't expected the lenses to appreciate in value because they "were essentially worthless" except for a "very unlikely" chance that the project would produce electricity at a commercial rate. Appellants' App'x vol. 9, at 2204. The Olsens disagree, arguing that the tax court should have credited Mr. Olsen's asserted belief in the technology based on expert testimony that the lenses could generate electricity.

The tax court declined to credit Mr. Olsen's asserted belief in the lens technology, and we afford "even greater deference to the trial court's [credibility] findings" than to other factual findings because the trial court had the opportunity to observe the witnesses' testimony. *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985).

The tax court explained its credibility determinations, noting that Mr. Olsen's testimony was "self-serving" and undermined by his statement that the equipment "'look[ed] a little like junk.'" Appellants' App'x vol. 9, at 2203–04 (quoting Appellants' App'x vol. 3, at 751 (Jan. 10, 2012 email from Mr. Olsen to his sister)); *see* p. 8, above. The Olsens don't say why this credibility finding was wrong, so we defer to the tax court's assessment of Mr. Olsen's expression of confidence in the system. *See United States v. Apperson*, 441 F.3d 1162, 1195 (10th Cir. 2006) (noting that an appellant had not explained how the district court had erred and had

11

thus "failed to sufficiently place [the] rulings at issue"); *see also* p. 10, above.

The Olsens argue that expert testimony shows the reasonableness of Mr. Olsen's alleged optimism about the technology. But this argument ignores much of the expert testimony.

The Olsens' expert witness testified that he had seen a test system and thought that it was "technically viable to generate electricity." Appellants' App'x vol. 7, at 1809. But this witness conceded that the system "wasn't connected to anything" and "wasn't putting anything on the [electric] grid." *Id.* at 1808–10.

The government's expert witness went further, testifying that the system

- couldn't generate electricity,

- might be able to generate electricity in five years, but only if Mr. Johnson were to change course by increasing his investment and hiring new experts, and

- would never be commercially viable.

The Olsens disregard much of the expert testimony, focusing only on the conclusion that the system might be able to generate electricity in five years. But the tax court could reasonably consider the rest of the expert testimony to find that Mr. Olsen hadn't expected the lenses to appreciate in value.

Finally, the Olsens rely on Mr. Olsen's testimony that he had bought roughly a million shares in International Automated Systems, Inc., the entity that had sold the solar lenses. The tax court didn't discuss this testimony, but it wouldn't have compelled a contrary finding. The tax court didn't question the profitability of International Automated Systems. According to the tax court, this entity obtained its profitability by selling lenses for prices "vastly" above the manufacturing costs. Appellants' App'x vol. 9, at 2178.

Mr. Olsen was one of those purchasers paying "vastly" above the manufacturing costs. So even if Mr. Olsen had expected the stock price of International Automated Systems to rise, why would he have expected a profit from the lenses that he had bought? He was locked into an arrangement to (1) buy the lenses for prices vastly above the manufacturing costs and (2) lease them for free unless the system were to produce revenue. *See* p. 3, above. And even if the system were to produce revenue, Mr. Olsen's company would recoup only $150 per year for each lens. *See id.* Mr. Olsen could thus expect International Automated Systems' share price to rise, but only at the expense of companies (like his) that had bought the lenses at inflated prices.

* * *

The record supports the tax court's finding that Mr. Olsen had not expected the lenses to appreciate in value. So the tax court did not clearly err in applying this factor.

*5, 6, and 7. The taxpayer's profits and losses. Treas. Reg. § 1.183-2(b)(5) to (7).* Factors 5, 6, and 7 concern whether the taxpayer had a reasonable hope of making a profit. Factor 5 addresses the taxpayer's "success . . . in carrying on other . . . activities," Factor 6 addresses the "taxpayer's history of income or losses with respect to the activity," and Factor 7 addresses "[t]he amount of occasional profits, if any, which are earned." *Id.* If the taxpayer has sustained losses beyond an initial startup period or realized only "[a]n occasional small profit from an activity generating large losses," the taxpayer is less likely to have a profit motive. Treas. Reg. § 1.183-2(b)(6) to (7). In contrast, taxpayers more likely have a profit motive when they've had sustained periods of net income or substantial occasional profits. *Id.* When taxpayers experience losses, the tax court can still find a profit motive based on a record of creating profits from unprofitable enterprises. Treas. Reg. § 1.183-2(b)(5).

The tax court found that these factors weighed against the Olsens. The lenses never generated any revenue for Mr. Olsen, and Mr. Johnson never produced a commercially usable volume of electricity. Despite the lack of revenue or production, Mr. Olsen continued to purchase more lenses. After Mr. Olsen made the down-payments for these purchases, the

14

promoters breached their promises by failing to place the lenses in service. Despite these breaches, Mr. Olsen didn't seek a refund. He instead continued to buy more lenses.

The Olsens argue that Mr. Olsen continued to buy lenses because he believed in the future success of the technology. But the tax court discounted Mr. Olsen's credibility, and the Olsens have not challenged the tax court's assessment of credibility. *See* p. 10, above. So the tax court could reasonably find that these factors had weighed against the Olsens. *See Cannon v. Comm'r*, 949 F.2d 345, 352 (10th Cir. 1991) (concluding that an eleven-year period of substantial losses constituted "persuasive evidence" that the taxpayer had no profit motive).

8. *The taxpayer's financial status, including other sources of income. Treas. Reg. § 1.183-2(b)(8).* This factor may weigh against a profit motive if the taxpayer has obtained "[s]ubstantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits)." *Id.* In applying this factor, the tax court found that this factor had weighed against the Olsens because Mr. Olsen (1) had "substantial wage income" and (2) used the losses from the lenses to nearly eliminate his tax liability.[5] Appellants' App'x vol. 9, at 2205.

---

[5]    In 2014, the Olsens apparently miscalculated and had to pay federal taxes of $1,538. The Olsens paid no federal taxes in any of the other years at issue. *See* p. 5 n.3, above.

The Olsens argue that this factor is neutral because any tax benefits from business losses would have been offset by the losses themselves. *See Engdahl v. Comm'r*, 72 T.C. 659, 670 (1979) ("As long as tax rates are less than 100 percent, there is no 'benefit' in losing money."). For example, if a taxpayer loses $1,000 and has a top marginal tax rate of 25%, the $1,000 deduction would yield tax savings of $250. But the taxpayer would still lose $1,000 in the business, creating a net loss of $750.

But this reasoning would apply only if the taxpayer had actually lost $1,000. The Olsens claimed losses based on the full purchase price of the lenses even though Mr. Olsen (1) had paid only 30% of the price at the time of purchase and (2) wouldn't owe the remaining 70% until after the system had started generating revenue. *See* p. 3, above. So the Olsens ultimately claimed more in tax deductions than they had paid for the lenses.

The Olsens counter that they might eventually need to pay the rest of the purchase prices. But the government's expert witness opined that the system would never generate a commercial volume of power. Without a commercial volume of power, the system would never generate any revenue and Mr. Olsen would never owe more for the lenses. So the tax court did not clearly err by treating the Olsens' losses as largely "artificial." Appellants' App'x vol. 9, at 2206.

16

*9. The presence of personal motives. Treas. Reg. § 1.183-2(b)(9).*
The final factor provides that taxpayers may lack a profit motive when they have personal or recreational motives for conducting the activity. *Id.* The tax court did not discuss any personal or recreational motives. But the Olsens invoke this factor, denying any purpose involving pleasure or recreation.

No one suggests a personal or recreational motive. To the contrary, the tax court found a motive to avoid taxes. That finding wasn't undermined by the absence of a personal or recreational purpose. *See Westbrook v. Comm'r*, 68 F.3d 868, 878 (5th Cir. 1995) (concluding that the lack of a personal or recreational purpose had been "outweighed by other facts establishing the lack of a profit motive").

\* \* \*

The tax court didn't clearly err in applying the nine regulatory factors.

### 2.    Five Signs of a Motivation Driven by Tax Benefits

We've identified five common characteristics of activities suggesting the absence of a profit motive: (1) the marketing materials focus on expected tax benefits, (2) the taxpayer buys the item for a grossly inflated price without negotiating, (3) the taxpayer doesn't ask the seller about potential profitability, (4) the taxpayer lacks control over activities, and (5) the taxpayer uses nonrecourse debt. *Nickeson v. Comm'r*, 962 F.2d 973,

17

977 (10th Cir. 1992). The district court could reasonably rely here on three of these circumstances:

1.    The marketing materials focused on projected tax benefits.

2.    Mr. Olsen paid a grossly inflated purchase price for the lenses without negotiating.

3.    Mr. Olsen lacked control over the business.

First, the marketing for the lenses focused on projected tax benefits. *See* Appellants' App'x vol. 9, at 2206. For example, the promotional materials said:

- "Your objective in purchasing your [solar-energy lens] systems is to zero out your taxes."

- "Buy our solar units with your tax money instead of giving it away to the IRS."

*Id.* at 2178, 2180. And an early email pitched Mr. Olsen on the tax benefits while saying little about the possibility of a profit:

Liz said you may be interested in our new solar tax credit program. I would like to set up a time where we could talk about it in more detail but I will give you the basics of the program now.

1.    Decide how much you owe in taxes (personally or business)

2.    Buy our solar units with your tax money rather than give it away to the IRS.

3.    Give the IRS forms #3468, #3800, #4562 and Schedule C instead of money.

4.    Receive nearly double your investment from the IRS in tax benefits.

18

> 5.  Get income off of your equipment for $35 [sic] years.
>
> Also, for each unit bought, our company will give $30,000 to a not-for-profit organization of your choice in your name if you would like to set this up too.

Appellants' App'x vol. 3, at 703. This marketing weighed against a profit motive. *See Nickeson*, 962 F.2d at 977 (stating that "marketing on the basis of projected tax benefits" is a "common component[]" of transactions lacking a profit motive).

Second, Mr. Olsen paid a grossly inflated purchase price without negotiating. Mr. Olsen conceded that he'd not negotiated the purchase price, and the record contains no evidence about the market value of the lenses. The promoters told Mr. Olsen the purchase price for each lens: $30,000 in 2009 and $3,500 from 2011 to 2014. After paying for the lenses, Mr. Olsen had to lease them to a Johnson entity. That lease would be free unless the system produced revenue. *See* p. 3, above. And if the system were to produce revenue, the Johnson entity would pay Mr. Olsen's company only $150 per year. *See id.* At that rate, it'd take over 23 years for Mr. Olsen to break even. And there was no evidence suggesting that the lenses would even last that long.

Despite the one-sided nature of the transaction, Mr. Olsen did not even try to negotiate the purchase price. The willingness to forgo any negotiation suggests the lack of a profit motive. *See Nickeson*, 962 F.2d

at 977 (stating that "grossly inflated purchase price[s] set without bargaining" are common components of transactions lacking profit motives).

Third, Mr. Olsen lacked control over the activities. In fact, after buying lenses for two years, Mr. Olsen admitted that he did not fully understand the project, explaining "that people ask[ed] [him] what it [was] specifically that they [would] be purchasing and [he didn't] know." Appellants' App'x vol. 9, at 2186. Given his lack of understanding, he apparently lacked any control over the operations.

Mr. Olsen not only lacked an understanding, but never took possession of the lenses that he had bought and couldn't identify which ones were his. Given his inability to identify his own lenses, the tax court could reasonably find a lack of control over the business, which would weigh against a profit motive. *See Nickeson*, 962 F.2d at 977 (stating that a "taxpayer['s] lack of control over activities" is a common component of transactions lacking a profit motive).[6]

---

[6]    We've said that nonrecourse liability could signal the lack of a profit motive. *See* pp. 17–18, above. The Olsens point out that Mr. Olsen incurred personal liability for his future payments. But those payments would become due only after the system had started generating revenue. *See* p. 3, above. And the tax court found it "very unlikely" that the system could ever create enough electricity to earn any revenue. Appellants' App'x vol. 9, at 2204. So even though Mr. Olsen could incur personal liability, the remoteness of that possibility could reasonably weigh against a profit motive.

\* \* \*

The Olsens haven't shown clear error in rejecting a profit motive based on the marketing materials, payment of a grossly inflated purchase price without negotiation, and lack of control. At most, the Olsens have shown that the tax court could have weighed the evidence differently. But more is necessary to show clear error. *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

### 3.    Motivation for Tax Benefits Rather than a Profit

The Olsens argue that a profit motive can exist when a taxpayer intends to make a profit after taxes even if the tax benefits were essential to profitability. The government takes a different approach, distinguishing between motives to profit and save in taxes. *See Simon v. Comm'r*, 830 F.2d 499, 500 (3d Cir. 1987) ("'[P]rofit' means economic profit, independent of tax savings."); *Thomas v. Comm'r*, 792 F.2d 1256, 1258 (4th Cir. 1986) (same); *Holmes v. Comm'r*, 184 F.3d 536, 543 (6th Cir. 1999) (same); *Wolf v. Comm'r*, 4 F.3d 709, 713 (9th Cir. 1993) (same). The tax court could reasonably reject a profit motive under either approach by doubting profitability even after the payment of taxes.

The Olsens rely on *Sacks v. Commissioner*, 69 F.3d 982 (9th Cir. 1995), where the Ninth Circuit held that a taxpayer's investment wasn't a

21

sham even though the activity had become profitable only because of a

solar energy credit. *Id.* at 991.[7] There the Ninth Circuit recognized that

- Congress sometimes used tax incentives to change investor behavior and

- when Congress did intend for tax incentives to change investor behavior, a profit motive might exist even if the tax benefit had been essential to profitability.

*Id*. at 991–92. But there the Ninth Circuit said that a profit motive cannot

arise solely from a desire for a tax benefit: the court must ask "whether the

taxpayer [had] intended to do anything other than acquire tax deductions."

*Id*. at 987. So taxpayers might have a profit motive if they intend for a tax

credit to turn an activity that's otherwise unprofitable into a profitable

venture. But it's not enough if the taxpayer's primary intent is to save in

taxes.

The Olsens have not shown an expectation for the solar leasing

business to become profitable even with the tax benefits. To the contrary,

the tax court found that Mr. Olsen had intended big tax losses to offset his

---

[7] Courts addressing allegations of a sham transaction generally ask two questions: (1) whether the taxpayer's "subjective business motivation" was to make a profit and (2) whether the transaction had "objective economic substance." *Jackson v. Comm'r*, 966 F.2d 598, 601 (10th Cir. 1992). Because the first question (subjective business motivation) requires us to determine whether a profit motive existed, we can draw on cases considering whether the transaction was a sham. *Nickeson v. Comm'r*, 962 F.2d 973, 976 (10th Cir. 1992). So we can consider the Ninth Circuit's opinion in *Sacks v. Commissioner* even though it involved consideration of a sham transaction.

wage income; and the Olsens have not shown clear error in this finding. So the Ninth Circuit's explanation doesn't apply here.

To reverse on this ground, we would need to conclude that taxpayers have a profit motive whenever their primary motives are to save in taxes. But we've said that a taxpayer lacks a good-faith profit motive when a transaction "was 'the naked sale of tax benefits.'" *Nickeson v. Comm'r*, 962 F.2d 973, 977–78 (10th Cir. 1992) (quoting *Brock v. Comm'r*, 58 T.C.M. (CCH) 826, 836 (1989)). We thus can't assume a profit motive whenever the taxpayer's primary motive is to save in taxes.

\* \* \*

The tax court found that Mr. Olsen had bought the lenses with the main purpose of saving in taxes rather than making a profit, and this finding wasn't clearly erroneous. So Mr. Olsen did not use the lenses in a trade or business or hold them for the production of income. The tax court thus correctly disallowed the depreciation deductions.

## V.    The Olsens could not obtain solar energy credits.

To obtain the solar energy credits, the Olsens needed to show a right to deductions for depreciation or amortization. I.R.C. § 48(a)(3)(C). But the Olsens could not claim the depreciation deductions because Mr. Olsen had lacked a profit motive. *See* Part IV, above. And the Olsens don't assert eligibility for amortization. So the Olsens could not obtain the solar energy credits.

23

In their reply brief, the Olsens argue that the credits would be available if the lack of a profit motive had constituted the only reason to deny the deductions for depreciation. For this argument, the Olsens assert that I.R.C. § 183 limits a depreciation deduction to the taxpayer's gross income from the activity. The Olsens lacked any income from the lenses, so this interpretation of § 183 would limit the depreciation deduction to zero. But the Olsens argue that the solar energy credits would remain available because the depreciation deductions were *limited* rather than *disallowed*. The Olsens waived this argument by failing to make it in their opening brief. *Wheeler v. Comm'r*, 521 F.3d 1289, 1291 (10th Cir. 2008).

## VI.    Conclusion

The tax court didn't commit reversible error in denying the depreciation deductions and the solar energy credits. So we affirm the tax court's decision.

24

*Preston Olsen, et al. v. Commissioner of Internal Revenue*, No. 21-9005
**BACHARACH**, J., concurring

I join with the majority opinion. But I write separately to add that even with a profit motive, the Olsens wouldn't have qualified for the desired tax benefits. For the depreciation deductions, the Olsens needed to show not only a profit motive but also placement of the lenses in service. Treas. Reg. § 1.167(a)-10(b). Property is "placed in service" when it is "placed in a condition or state of readiness and availability for a specifically assigned function." Treas. Reg. § 1.167(a)-11(e)(1)(i).

The Olsens argue that the lenses were placed in service as components of a solar energy system or as property held out for lease. But the tax court properly rejected both arguments.

1.    **The lenses were not placed in service as components of a solar energy system.**

We haven't decided when a component is placed in service. Is the component placed in service when it's ready to be used in the larger system even if it's not ready to operate? Or is the component placed in service when the system as a whole is available for the component's specifically assigned function? The Olsens urge the first approach, but the tax court adopted the second approach.

I would conduct de novo review of the tax court's approach. *See Sealy Power, Ltd. v. Comm'r*, 46 F.3d 382, 393 (5th Cir. 1995) (conducting de novo review of the tax court's definition of the legal standard for

determining when an asset is placed in service); *Armstrong World Indus., Inc. v. Comm'r*, 974 F.2d 422, 431 (3d Cir. 1992) (conducting "plenary review" of the tax court's approach to determine when components of a larger system had been placed in service).

The Fifth Circuit has considered when interdependent components are "placed in service." *Sealy Power, Ltd.*, 46 F.3d at 390. When the components are "designed to operate as a system," the Fifth Circuit considers a component "placed in service" only when "the entire system reaches a condition of readiness and availability for its specifically assigned function." *Id.* The Third Circuit has adopted the same approach: When a part is "essential to the operation of the project as a whole and cannot be used separately to any effect," the part is placed in service only when the whole project enters service. *Armstrong World Indus., Inc.*, 974 F.2d at 434.

I would adopt this approach because a part is "read[y] and availab[le] for a specifically assigned function" only if it can serve that function. Treas. Reg. § 1.167(a)-11(e)(1)(i). If a part can serve its assigned function only as a component of a larger system, the part would enter service only when the rest of the system is ready and available for use.

The Olsens take a different approach, citing

- a tax court opinion holding that a component of a solar energy system constitutes solar energy property, *Cooper v. Commissioner*, 88 T.C. 84, 116–17 (1987), and

2

- opinions discussing whether equipment had been placed in service when it was ready to use, but not operated through no fault of the taxpayer.

These opinions shed little light here.

The first opinion, *Cooper*, does not address when components of an energy-generating system are placed in service. In *Cooper*, the court did discuss components of energy systems. But this discussion focused on placement into service when a system had been held out for rent. 88 T.C. at 113–14. So *Cooper* could bear on whether the lenses had been placed in service in an equipment-leasing-business—but not in a power-generating system. *See* Part 2, below.

The Olsens also point to opinions addressing placement into service when external circumstances prevented use of the property. For example, property may be unusable because of the weather. *See Schrader v. Comm'r*, 34 T.C.M. (CCH) 1572 (T.C. 1975) (air conditioner installed but not needed due to weather), *aff'd*, 582 F.2d 1374 (6th Cir. 1978) (mem.); *Sears Oil Co. v. Comm'r*, 359 F.2d 191, 198 (2d Cir. 1966) (barge delivered and outfitted, but unable to be used until a frozen canal had thawed). Or property may become useable only when other work is done. *See SMC Corp. v. United States*, No. CIV-1-79-252, 1980 WL 1636 (E.D. Tenn. Aug. 12, 1980) (unpublished) (shredder and crane could not be operated until a utility had installed power lines), *aff'd,* 675 F.2d 113 (6th Cir. 1982) (per curiam). These opinions don't bear on when a component of a

3

larger system is ready for its assigned use. So I would conclude that the tax court applied the right legal standard.

Because the tax court used the right legal standard, I would review its application of that standard for clear error. *See Ampersand Chowchilla Biomass, LLC v. United States*, 26 F.4th 1306, 1312–14 (Fed. Cir. 2022) (applying the clear-error standard to the Court of Federal Claims' conclusions about power facilities' specifically assigned functions and the years that they'd been placed in service). The lenses would have entered service only if the system itself had been ready and available for its designated purpose of generating commercial electricity. The tax court didn't clearly err in finding a failure to prove that state of readiness and availability.

The tax court applied five factors to determine whether the system was ready and available to generate commercial electricity:

1.   "[W]hether the necessary permits and licenses for operation have been obtained . . . ."

2.   "[W]hether critical preoperational testing has been completed . . . ."

3.   "[W]hether the taxpayer has control of the facility . . . ."

4.   "[W]hether the unit has been synchronized with the transmission grid . . . ."

5.   "[W]hether daily or regular operation has begun."

4

*Sealy Power, Ltd. v. Comm'r*, 46 F.3d 382, 395 (5th Cir. 1995). The tax court found that each factor weighed against a finding of placement into service:

> [The Johnson companies] had obtained no permits for operation of a solar energy plant. There is no evidence that they had completed "critical preoperational testing." Quite the contrary: [the government's expert] in reviewing Mr. Johnson's material discovered "no tests, no test reports, [and] no documentation of any type" and found no evidence that the Delta site had "been recently used for any test activity." The solar plant had not "been synchronized with the transmission grid"; "daily or regular operation" of the facility obviously had not begun; and no one had assumed "control" of a functional power plant. Indeed, [the government's expert] credibly testified that the project, even if completed, would never be capable of generating electricity on a commercial scale.

Appellants' App'x vol. 9, at 2209.

The Olsens do not challenge the tax court's application of these factors, arguing instead that the plant had "reach[ed] a condition of readiness and availability for its specifically assigned function—to generate electricity." Appellants' Opening Br. at 26. But the Olsens have not shown that the plant was ready and available to generate commercial electricity.

The Olsens' expert witness did not undermine the tax court's finding. The expert witness testified that even though he'd seen a tower generate electricity, the system "wasn't connected to anything." Appellants' App'x vol. 7, at 1806–08. Given the lack of a connection, he acknowledged that

5

- production of energy for an electric grid would have required the Johnson enterprises to buy more equipment,

- only one tower had a full array of 70 lenses, and

- "thousands of lenses" had not been installed.

*Id.* at 1835. This expert testimony doesn't suggest readiness or availability of a system to generate commercial electricity.

And the government's expert witness confirmed that the system hadn't been placed in service. He testified that

- the existing design would not allow generation of usable electricity and

- the system could generate usable electricity in five years only if Mr. Johnson were to replace his team with expert engineers.

Given the expert testimony, the tax court reasonably found that the Olsens had not shown the system's readiness to generate usable electricity. So the tax court didn't clearly err in finding that the Olsens' lenses hadn't been ready and available for their designated purpose.

## 2. The lenses were not placed in service in an equipment-leasing business.

The Olsens argue in the alternative that they placed the lenses into service in an equipment-leasing business. But the Olsens do not address the tax court's factual finding that the lenses had never been held out for lease.

For this finding, I would apply the clear-error standard. *See Ampersand Chowchilla Biomass, LLC v. United States*, 26 F.4th 1306, 1312–14 (Fed. Cir. 2022) (applying the clear-error standard to the Court of

6

Federal Claims' conclusion about facilities' specifically assigned functions and the year that they'd been placed in service); *Armstrong World Indus., Inc. v. Comm'r*, 974 F.2d 422, 429–30 (3d Cir. 1992) (applying the clear-error standard to the tax court's determination of when leased properties had been placed in service).

Because the Olsens do not address the tax court's reasoning, they have not shown clear error. *See United States v. Apperson*, 441 F.3d 1162, 1195 (10th Cir. 2006) (noting that an appellant had not explained how the district court had erred and had thus "failed to sufficiently place [the] rulings at issue"). So even if the Olsens had shown a profit motive, they wouldn't have been entitled to the depreciation deductions. And without eligibility for these deductions, the Olsens couldn't have obtained the solar energy credits. *See* Maj. Op., Part V.

\* \* \*

Because the lenses weren't placed in service, the Olsens couldn't have obtained the depreciation deductions or energy credits even if Mr. Olsen had a profit motive.

7